[Civ. No. 9014. First Appellate District, Division Two.—June 29, 1933.]

STEWART L. CREBS et al., Appellants, v. UPLIFTERS COUNTRY HOME (a Corporation) et al., Respondents.

Hunsaker & Cosgrove and William A. Barnhill for Appellants.

Loeb, Walker & Loeb and Le Roy M. Edwards for Respondents.

STURTEVANT, J.—The plaintiffs, minority stockholders, commenced an action in behalf of themselves and all other interested persons against the defendant corporation and the directors thereof to obtain a judgment setting aside a written transfer and to obtain an accounting. At the end of the plaintiffs' case the trial court ordered a nonsuit. From the judgment entered thereon the plaintiffs have appealed.

In their complaint the plaintiffs did not plead actual fraud and on the trial they did not introduce evidence proving or tending to prove actual fraud. However, it was the theory of their case that the transaction complained of constituted constructive fraud.

In 1920 a number of men residing in Los Angeles were invited to attend an outing given by the Family Club of San Francisco. They were so pleased with the entertainment, accommodations, surroundings, etc., that they commenced to discuss the formation of a club of their own. The result of those discussions led to the formation of a club named "The Uplifters". Soon after the club was organized it became advisable to consider the matter of incorporating. At that time the provisions of the federal statutes were such that admission fees to a club were taxed. For the purpose of avoiding the taxation burdens two separate corporations were formed. The club was formed as a nonstock, nonprofit, social organization under the name of "The Uplifters". Members of the club formed at the same time a stock corporation under the name of "Uplifters Country Home". At the time the latter corporation was formed the articles provided for a capital stock of $150,000 divided into 600 shares of the par value of $250 each. The first subscribers, those named in the articles of incorporation, were all members of the club. The directors of the two corporations were identical or nearly identical at the time of the formation of the two corporations and from time to time thereafter. Shares in the stock corporation were sold only to members of the club. Soon after the stock corporation was formed it purchased a tract of real estate in Rustic Canyon near the city of Santa Monica, in Los Angeles County, and commenced

to improve it by building thereon and making other improvements. It built and furnished a clubhouse and many other buildings; it laid out and equipped a polo field, and in short did many things to make the property a country place of recreation. Many members of the club, acting as individuals and for their individual use, constructed buildings on the property so owned by the Uplifters Country Home.

In June, 1921, the Uplifters Country Home and The Uplifters executed a lease for the term of fifty years. By its provisions Uplifters Country Home leased to The Uplifters all of the real estate it then owned together with the improvements thereon. It also agreed to buy additional lands and to erect such other improvements as the lessee might desire in a sum not to exceed $250,000. It agreed not to lease, or purchase, or acquire any interest in any other real property except on the written permission of the lessee. Any additional property purchased it agreed to lease to the lessee without any additional charge. The expenditures on any of said property were to be made under the supervision of the lessee and for such things as the lessee might request. The consideration for said lease was $10 per annum and a covenant that the lessee would pay all taxes, liens, assessments and claims assessed against the property leased or thereafter acquired by the lessor. That item is stated as amounting to $18,000 annually. Both parties agreed that the lessor would not sell any of its stock except to members of the lessee. The lessor further agreed that the members of the lessee might remove any buildings they had built on the lessor's land. Having acquired some additional lands on the thirteenth day of April, 1927, the same lessor leased to the same lessee for the term of ten years all of the lands so acquired. The covenants contained in the lease are similar to those recited in the first lease. The plaintiffs pleaded one lease and the defendants pleaded the other. The genuineness and due execution of each was admitted by the pleadings. (*Rosenthal* v. *Merced Bank,* 110 Cal. 198, 203 [42 Pac. 640].) On the twenty-sixth day of January, 1929, the Uplifters Country Home and The Uplifters executed a written contract which is the object of attack by the plaintiffs in this case. By the terms of that instrument The Uplifters sold and assigned to Uplifters Country Home all of its interests in both of the leases. It also sold and assigned to that com-

pany all of its personal property, accounts and other assets. The purchaser assumed the debts of the seller. Both parties assert the instrument was an agreement whereby The Uplifters was merged in the Uplifters Country Home.

In their complaint the plaintiffs did not plead the contract *in haec verba,* but they alleged that it was neither executed for a adequate consideration nor any consideration whatever. That allegation was denied by the defendants. On the opening of the trial the plaintiffs made an extended statement showing in detail the facts on which they based their allegations. The defendants made an extended reply. The two statements showed that the parties did not disagree as to the probative facts, but did disagree as to the ultimate facts and the conclusions of law to be drawn therefrom. Thereupon the plaintiffs called the officers of the defendant corporation and other witnesses, and introduced evidence in minute detail which they claimed supported their allegations. They produced the ex-secretary and one of defendants' attorneys. They introduced the books, copies of accounts, minutes and correspondence of the defendant corporation and its officers. Few objections were made and none was sustained so far as counsel have noted in their briefs. In presenting their case the plaintiffs claimed the right to introduce proof on every issue made by the pleadings. They proceeded accordingly. When the plaintiffs rested every single material fact had apparently been examined into. Thereupon the defendants made a motion for a nonsuit, which was granted and, as recited above, the plaintiffs have appealed from the judgment entered thereon.

It is first contended that the consideration for the merger agreement was inadequate. The point involves the accounts as of the date of the merger agreement. The plaintiffs introduced balance sheets dated August 31, 1928. They take their figures from those sheets. The Uplifters Country Home so kept its books as to show a charge against The Uplifters for depreciation in the sum of $50,034.88. The plaintiffs have not quoted any facts and have not cited any authorities showing that said charge was a legal charge against The Uplifters. They intimate that the "Saddle Club" was indebted to the Uplifters Country Home. Be that as it may, the accounts of the Saddle Club were included in those of The Uplifters as shown by the balance

sheet. That sheet showed a debt, cash advanced to The Uplifters by the Uplifters Country Home, $84,506.54. It also showed accounts payable, $15,347.59. The sum of those two items is $99,854.13. But, as shown above, that computation is of the date of August 31, 1928. In payment of said amount The Uplifters assigned its personal property and accounts receivable. As shown by the same sheet those items were of the value of $53,133.72. It also transferred to the Uplifters Country Home a membership list showing monthly payments in dues of $4,605, or the total sum of $55,260 annually. Furthermore, it assigned the two leases which it held on the lands owned by the Uplifters Country Home. Those lands and improvements the plaintiffs claim were of the value of $1,500,000. The value of the leasehold, it was testified, was from $50,000 to $75,000 per annum. All of the foregoing facts had been developed without conflict when the plaintiffs rested. No witness testified how the accounts stood as of the date of the merger. Mr. Paine, president of Uplifters Country Home, issued a financial statement as of date September 30, 1929, in which he stated many facts regarding the relations of the two corporations. Among others, he stated: "This would reduce the actual indebtedness from the social club to the corporation as of October 1, 1928, to $29,735.96. It is stated by Mr. Murphy that the assets of the social club other than its lease were of the actual value of approximately $50,000. This sum more than offsets the liabilities that were canceled." Adding together the values of the things transferred and comparing the total of that sum with the total amount of the sums paid therefor, it may not be said that the consideration was inadequate. If the balance leaned in favor of either side it was in favor of the minority stockholders. ■ The plaintiffs quote the rule as follows: " . . . a majority of the holders of stock owe to the minority the duty to exercise good faith, care and diligence to make the property of the corporation in their charge produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and deliver to them their just proportion of the income and of the proceeds of the property." (*Union Pac. R. Co.* v. *Frank*, 226 Fed. 906, 920.) The rule as stated is clearly the law. But the record before us shows the de-

fendants performed every one of those duties and violated no one of them.

But, the plaintiffs argue, there are other facts on which they rely. They say: "Before we consider the effect of the agreement—what it accomplished—we wish to make it clear that we make no point whatever that these five directors were interested directors within the settled rule. Necessarily they were, under the mechanics of the by-law of the land corporation we have discussed above, and in such a way that appellants cannot complain on that score. Under that by-law, which was, and is, binding on appellants, every act of the directors of the land corporation was necessarily, at least, theoretically, the act of interested directors, and to this appellants as stockholders impliedly consent. *But we do invoke the rule—thereafter discussed—that these directors, even though interested in such a way as to occasion no complaint of their acts as such, are forbidden to use their position to benefit themselves and the majority, of whom they are a part, to the detriment of the minority stockholders.*" (Italics by plaintiffs.) They then quote as follows: "Where the majority of a company propose to benefit themselves at the expense of the minority, the court may interfere to protect the minority." (*Menier* v. *Hooper's Telegraph Works,* 9 Ch. App. Cas. 350.) In what we said in discussing the last point it is at once apparent that the defendants did not "benefit themselves" at the expense of the minority. As the record stands, it would appear the minority got more than it was entitled to.

Preceding the annual meeting of October 27, 1928, the matter of the merger was discussed among some of the stockholders. That discussion was given the widest publicity. When the meeting convened more than two-thirds of the stockholders gave their consent to the merger after the subject had been fully discussed. At that same meeting a new board of directors was chosen for the purpose of adopting and formulating a plan. The meeting then adjourned to reconvene on the last Saturday in January, 1929. On that date the agreement was presented, approved and signed by authority of the board of directors and on the same date it was presented to an adjourned meeting of stockholders and was ratified by a vote of more than a majority of them. Some dissenting voices having been heard, the matter was

brought up at the stockholders' meeting in October, 1929, and was again ratified by stockholders representing 1298 shares voting in the affirmative out of a number holding 1431 shares out of a total authorized issue of 1692 shares. Stockholders representing 147 shares only voted in the negative. The defendants claim these ratifications constitute defenses. If one corporation was suing the other the contention would be sound. (*San Diego O. T. & P. B. R. Co.* v. *Pacific Beach Co.*, 112 Cal. 53 [44 Pac. 333, 33 L. R. A. 788].) But in the instant case the plaintiffs stand as minority stockholders claiming that the contract was fraudulent. As we understand them it is their contention that the so-called ratifications were but the consents of the stockholders, without which the instrument would not have constituted a contract. (Sec. 361a, Civ. Code; Stats. 1903, p. 396.) Continuing, they claim that although a purported contract is ratified by the majority stockholders, nevertheless the minority may come into a court of equity and ask for a cancellation if they can show that the purported contract had the result of dividing the assets, more or less, between the majority stockholders to the exclusion of the minority. *Colgate* v. *United States Leather Co.*, 73 N. J. Eq. 72 [67 Atl. 657, 663], is an authority to the contrary. It was reversed on other grounds. We have not had called to our attention any other authority that is directly in point. For these reasons we do not feel called upon to decide the question.

It is said the contract of merger was written in secrecy. That statement rests on the fact that the attorneys who wrote it did not, prior to the meeting of the board of directors at which it was adopted, advise Mr. Lawler that they were writing the instrument. Such fact did not prove nor tend to prove any issue made by the pleadings.

It is intimated that the accounts receivable which were assigned by The Uplifters were not collectible. However, there was no evidence what accounts were receivable or were assigned by The Uplifters. Accounts held in August, 1928, may have been paid prior to January 26, 1929. As to whether they were paid or were not paid, as to whether they were disputed or undisputed, and as to whether the debtors were solvent or insolvent, no evidence was introduced. The plaintiffs contend the evidence which they had introduced was such that the motion for a nonsuit should have

been denied. (9 Cal. Jur. 551.) In view of the facts to which we have referred we think the plaintiffs are mistaken and that their case is governed by that portion of the text that appears in 9 California Jurisprudence, page 559. It is there said: ''In accordance with the foregoing rules, a court may grant a motion for nonsuit whenever the evidence brought out upon the direct or cross-examination of the plaintiff so conclusively establishes a defense as that the court might properly grant a new trial in case of a verdict in his favor upon like evidence.'' Conceding for the purposes of this decision that in the instant case the defendants were bound to show that the contract was just, fair and reasonable, it is apparent from what we have said that the plaintiffs' evidence relieved the defendants of that burden—the plaintiffs made the showing for the defendants.

After an examination of the entire cause, including the evidence, this court is wholly unable to form the opinion that the order granting a nonsuit has resulted in a miscarriage of justice.

The order appealed from is affirmed.

Nourse, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 29, 1933, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 28, 1933.