[Civ. No. 16085. Second Dist., Div. Two. June 3, 1948.]

GEORGE DONALD MEADOWS, Appellant, v. EMETT AND CHANDLER (a Limited Partnership), Respondent.

[Civ. No. 16086. Second Dist., Div. Two. June 3, 1948.]

GEORGE DONALD MEADOWS, Appellant, v. EMETT AND CHANDLER (a Corporation) et al., Respondents.

(1)

MacDonald & Pettit and Robert H. Edwards, Jr., for Appellant.

Cosgrove, Clayton, Cramer & Diether, T. B. Cosgrove and Leonard A. Diether for Respondents.

MOORE, P. J.—Two separate actions are here involved—one against a corporation, herein referred to as respondent, the other against the partnership comprised of the two stockholders of the corporation. The latter entity had been engaged in the insurance brokerage business since 1929 when it was organized as "Gillis, Emett and Chandler" and so continued to February, 1939, when "Gillis" was dropped from the corporate name. Its principal place of business was in Los Angeles but it maintained a branch office in San Francisco. Emett was the president and general manager of the corporation at all times prior to its dissolution, and transacted all its business with appellant. The latter had been an insurance solicitor for six years prior to his meeting with Emett on February 9, 1939, when the two conferred in the San Francisco office of respondent with reference to appellant's employment as manager of that office. Pursuant to agreement, two days after their conference appellant addressed a letter to Emett as follows:

"This is to confirm our conversation and agreement of Thursday, February 9, 1939. On March 15, I shall begin my work with the understanding that my entire time is to be spent in servicing and expanding the accounts of Gillis, Emett and Chandler, Ltd.

"I am to receive $375.00 monthly which is to include expenses with the exception of any specifically authorized and for any incidental personal business which I might acquire I am to receive one third of the commission.

"Trusting this confirms our mutual understanding . . ."

Commencing March 6, 1939, appellant continued in the employment of respondent for three years. In September, 1940, he was introduced to an official of a railroad company by a friend and as a result of negotiations conducted by him and Mr. Emett a policy of insurance was sold by respondent to the railroad company. Appellant left his position in February, 1942. In 1943, respondent was dissolved and its business and obligations were assumed by the partnership.

In 1946, having returned from military service, appellant commenced these actions: (1) against the partnership, appeal number 16085; (2) against the corporation, number 16086. The gist of both actions was appellant's claim to a share of all the commissions earned on the railroad's insurance premiums. The brokerage collected by respondent out of premiums paid by the railroad company aggregated a sizable sum. On a trial of the consolidated cases following the introduction of appellant's evidence, motions for nonsuits were granted in both.

These appeals are to determine (1) whether the contract of employment entitled appellant to a share of such commissions collected by the corporation and, after its dissolution, by the partnership; and (2) if it did, whether such right was defeated by respondent's special defenses. In reaching such determination it will be necessary to pass upon only the questions raised by the second numbered appeal—that of respondent corporation.

Appellant's argument is based largely upon the facts that he alone was first introduced to the railroad officials by his friend Coney, and second that he worked with Emett in conducting the negotiations with the railroad company's officials. To justify such recovery the phrase "for any incidental personal business which I might acquire" must be held to include the sale of the policy to the railroad. Such construction of the last-quoted language must be derived either (a) from the phrase itself in the light of the acts of appellant or (b) from the construction placed upon such acts by the manager of respondent.

A scrutiny of all the evidence favorable to appellant discloses the correctness of the judgments.

## The Writing

The only memorial of the agreement is the letter of appellant quoted above. According to that document he was to receive a fixed salary and one third of the commissions paid on any "incidental personal business which I might acquire." Appellant contends that the railroad business is comprehended by the quoted clause, while respondents contend that it was neither personal nor incidental but was procured by the joint efforts of president Emett and appellant as a salaried employee of respondent and at its expense. Since the phrase "incidental personal" is not commonly used to describe business to be obtained by an employee, the court below received evidence of the circumstances of the employment as well as of the behavior of the parties towards the matter of soliciting the business and their treatment of it after the first premium had been paid.

## Preliminary Conversations

At the time of the agreement Emett and the witness Drenth advised appellant that they were in need of a manager for the San Francisco office since they were acquiring much business from a wholesale paper company. In response to certain inquiries by Emett, appellant stated that he desired a position where he could participate in business that he produced. Emett replied that while he might make some satisfactory arrangement he did not desire a manager spending all his time soliciting his own business. After appellant had made it clear that his own business was not extensive, Emett told him that he was not to spend his time soliciting his own business; that he should devote all his time to the existing accounts of respondent; that his principal occupation would be to service Emett and Chandler accounts; that there is "enough business on the books to keep a man busy full time"; that he "did not want him to chase around after personal business"; "if you can produce an account or get an account without taking too much time, I will pay you one third of the commission." To this appellant agreed.

## Subsequent Interpretation of the Agreement

The mutual understanding of their agreement was emphasized by letters of both parties during the first month of the employment. On April 3, 1939, Emett wrote appellant to be particularly careful to mark all accounts originated by appellant's "leads and connections not emanating" from the

corporation. Appellant's letter of April 4, 1939, indicates that his understanding was "that my entire time is to be spent in servicing and expanding the accounts of Gillis, Emett and Chandler, Ltd . . . It is fully understood that my *contingent* [meaning his right to receive a portion of the commissions on personal business] is to only be on whatever business I produce through my former contacts and not through leads or connections emanating from our office." From his own understanding of his employment there could be no doubt that his total time was to be devoted to the business of his employer, except such incidental matters as might come to appellant by reason of renewals or from personal attachment to a client. In June, 1940, the rate of appellant's contingent was increased from one third to 45 per cent of the commissions received by the corporation on such "incidental personal business" as he should acquire for the corporation.

### APPELLANT'S HANDLING OF CONTINGENT ACCOUNTS

The method of segregating appellant's "incidental personal business" evidences the mutual understanding and intention of the parties. Appellant prepared bills to his personal clients for the premiums on such policies as they had taken or renewed, and marked them "D M" to indicate that they were "incidental personal" business. Copies of such bills so marked were mailed to the Los Angeles office. No other scheme was followed by appellant to indicate his right to the "contingent" on the business placed by him. In the Los Angeles office on the first of each month with the aid of appellant's bills a statement was prepared showing the insurance sold by appellant during the previous month and claimed as his "incidental personal business." Such statement was forwarded to appellant. Also, periodically a summary of such monthly statements was sent to appellant with a check for the total.

### SALE OF THE RAILROAD POLICY

With the foregoing view of the employment contract as interpreted by the parties the true significance of the evidence bearing upon the sale of the railroad policy by respondent will readily appear. Contact with the railroad officials resulted from a combination of factors. Two are outstanding. In August, 1940, respondent carried the insurance account for Zellerbach Paper Company whose insurer was the Aetna Company. Servicing Zellerbach necessitated meetings of appellant as respondent's agent and Aetna's representative, Mr. Coney. While appellant asserts his claim by virtue of Coney's friend-

ship, the Zellerbach-Aetna connection with respondent appears to have been just as effective in bringing Coney to respondent's office. Coney had an inquiry from one Cox, in charge of the railroad's insurance, concerning a policy for the railroad. With Cox's consent Coney asked appellant to accompany him to inspect the railroad's policies. On Sunday, September 1, 1940, and the day following, appellant and Coney met with Cox's assistant, Herbert, in San Francisco. Appellant pointed out to Herbert that the railroad had duplicate coverage and suggested a type of policy covering its total liability. Herbert stated to appellant that if the latter would visit the Omaha office of the railroad he could there secure the information with reference to gross revenue, accident frequency, and records of the Interstate Commerce Commission. Thereupon correspondence passed between Emett and appellant wherein the latter stated that he had directed Herbert to call on Emett at Los Angeles. Herbert called on September 5 for the purpose of ascertaining whether respondent was competent to handle the railroad account.

## AETNA WILL NOT INSURE THE RAILROAD

A few days after the conference of Emett and Herbert, Coney advised Cox by letter that Aetna could not write the railroad policy and "felt Mr. Herbert's time would not be entirely wasted if we did not get together by reason of the contact with Emett and Chandler. I can recommend them as an excellent brokerage firm and if you see fit to allow them to submit a proposition I am certain they will turn in a good job." After Aetna declined to write the railroad policy appellant wrote Cox on September 13, that Zurich General Accident and Liability Insurance Company might write the policy, and indicated that he or Emett might visit Omaha to obtain more information before conferring with Zurich. Also, he asked Emett's permission to visit Cox in Omaha and Zurich in Chicago. Emett consented and respondent advanced the necessary funds for the journey. Appellant proceeded to Omaha where he obtained the information required for the underwriter, and met Cox in Chicago about October 15. Late in November the two conferred with Emett in Los Angeles concerning the railroad's insurance.

## APPELLANT'S ASSERTED EXPENDITURES

The only positive evidence in support of a denial of the nonsuit was appellant's testimony that on the trip to the eastern cities he expended $500 of his own funds for enter-

tainment. Such testimony is not substantial in view of other established facts. Not only was he absent from the San Francisco office for more than two weeks but before his departure he was supplied with funds for his expenses. Not only did his contract entitle him to the payment by respondent of all necessary outlays made in the pursuit of respondent's prospects but he actually received the money for such expenses before his departure. He thereby impliedly conceded that he was off to sell insurance to respondent's prospect. If appellant had considered the railroad policy as his "incidental personal" business would he have accepted funds from respondent to pay his traveling expenses without a previous understanding as to any obligation to be incurred thereby?

No suggestion was made by anyone prior to the visits to the eastern cities that appellant should or would expend his own money in pursuit of the railroad insurance. Upon his return he made no demand for repayment and at the trial could give no details of place, persons or of substance purchased. His testimony is also that his correspondence with Cox concerning the railroad insurance in the closing weeks of 1940 was directed by Emett, and all of it bore the signature of Emett and Chandler. Also, he testified that he made a second trip to Omaha in December, 1940. His own letters written to Cox at Omaha definitely establish that he was in San Francisco throughout the entire month.

## EMETT'S EFFORTS EFFECTIVE

It is a glaring fact that Emett was also active in the campaign to place the railroad insurance. In addition to his early conferences with Cox, Herbert and appellant, he supervised appellant's correspondence with the railroad officials, visited Cox in Omaha in January to discuss the policy, induced Zurich to reduce the initial premium by 50 per cent and in February, 1941, was instructed by Cox to put the insurance in effect March 1, 1941, and requested appellant to "furnish binders for the primary and excess coverage."*

---

*As insurance terms: A *binder* means "a written instrument, used when a policy cannot be immediately issued, to evidence that the insurance coverage attaches at a specified time, and continues, subject to a maximum limitation, until the policy is issued or the risk is declined and notice thereof given." "A binding receipt." (Webster's International Dictionary.)

*Primary coverage* means: The aggregate of risks covered by the terms of a contract of insurance.

Emett then directed Zurich to forward a binder on primary coverage to Mr. Cox and requested appellant to obtain a "binder on the excess coverage" and to forward it to Cox.

## APPELLANT SENT NO BILLS FOR A SHARE OF
### THE RAILROAD BUSINESS

It is significant that with all his bills for his *contingencies* sent to respondent after the sale of the railroad insurance, appellant did not include his claim for a share of the brokerage on that policy. He sent the bill for the first premium of $5,000 on the policy effective March 1, 1941. He received payment therefor on May 8, 1941. Thereafter not one of the monthly statements as to appellant's "incidental personal business" sent to respondent made reference to the railroad's premium. None of respondent's summary statements of appellant's "contingent" business covering the periods from March 1, 1941, to April, 1942, referred to the railroad policy. Neither did appellant object to either monthly or summary statements because of such absence of reference to the railroad premium, but received and cashed all checks sent to him in payment of the summary statements. His testimony at first was that he did object to the first summary; this however was corrected by him as referring to discussions with Emett in November and December, 1941. In that discussion appellant stated that he had spent some of his own money on the railroad business and asked when he could expect his commission; that he did not expect his "full cut" and suggested that they go back "to our old arrangement." Emett replied that they would "wait now until the end of the year and see what it is. We will make a new deal." Appellant declared then that "down to 25 per cent might be fair." They mutually agreed to "wait until the end of the year, around March 1 to see what had developed in the premiums."

Such agreement to wait did not constitute proof of an alteration of the contract of employment. Neither did it make the railroad policy a part of appellant's "incidental personal" business. At that time appellant thought that 45 per cent of the railroad's premium as his share would be unfair to respondent. What could be unfair about it if it was his "incidental personal business"? It is inconsistent and unreasonable to contend that the brokerage on the railroad's premium was his "incidental personal business" and yet, first, confess that the percentage they had agreed upon as his share of such business was "not fair" and, secondly,

agree to accept a reduction of his share from 45 per cent to 25 per cent. If appellant had really believed that his contract entitled him to 45 per cent of the commission it is unlikely that at the time of making the first demand for his share he would have offered to reduce his portion to 25 per cent.

APPELLANT OFFERS TO ACCEPT 1 PER CENT

But appellant's eagerness to participate in the profits of the railroad's premiums reached a crescendo before another year had expired. The metamorphosis of his ambition during the 12 months cannot be definitely determined, but it is clear that he was aiming at some conquest however slight. He testified that he wrote Emett a letter sometime during the latter seven months of 1942. He had kept no copy but from his testimony it can be inferred only that he merely requested a share of the commissions on the railroad premiums, as he had done orally in the preceding December. On January 19, 1942, he asked for an increase of salary instead of the customary annual bonus paid by the corporation. At Emett's request he prepared a memorandum which he delivered to Emett. It is as follows:

"J-n. 19, 1942

"On or about March 1, 1942, my salary and expenses are to be $550 per month. It is understood that I will not receive any Xmas bonus.

Don Meadows.

"As an indication of recognition on the Union Pacific I'm to receive 1% of the Commission until further notice effective Jan. 1, 1942."

Two reasonable deductions instantly occur: (1) if appellant had had an agreement to share in commissions on the railroad premium he would not have offered to receive 1 per cent instead of 45 per cent; (2) his demands were not to enforce a right created by his contract of employment but to gain an increase of steady income.

AFTER HIS DISCHARGE APPELLANT MAKES NO DEMAND FOR A SHARE OF THE BROKERAGE ON THE RAILROAD PREMIUMS

Thirteen days after the conference and the memorandum above quoted Emett wrote appellant that upon a consideration of the demands made by appellant the corporation had decided to accept his resignation. Appellant was paid to March 11, 1942, and immediately asked for his percentage of the

commissions on his "incidental personal business," without a suggestion of the railroad premium. Neither was it mentioned in Emett's reply and check covering the period from July 1, 1941, to December 31, 1941, which check appellant accepted without protest.

In May, 1942, appellant continued his correspondence with the corporation in order to collect all moneys due him on his "incidental personal business." While suffering the chagrin attendant upon his discharge, in no letter to respondents did he make reference to the railroad policy. His letter of May 25, 1942, although it concerned his personal business, made no reference to the railroad premiums but suggested only that the corporation send "my commission check." On June 8, 1942, Emett forwarded a check for commissions due appellant on the statement attached, with these words: "This includes all outstanding items with the exception" of certain unpaid premiums. The railroad premium was not among them. Appellant did not intimate displeasure at the failure of the check to include a share of the railroad's premium or of the letter to mention it.

The only written communication from appellant that made reference to the railroad insurance subsequent to his discharge was his letter written at some time between May, 1942, and February, 1943. Of that he had no copy and Emett denied its receipt. The oral proof of its contents was that appellant "would appreciate an accounting of his share of the railroad premium." In the fall of 1942, appellant stated to the manager of the San Francisco office that the corporation owed him commissions and expenses by reason of the railroad account. The manager referred him to Emett who did not hear from appellant until October, 1945, when Emett rejected the claim.

### AUTHORITIES

 Nonsuit should be denied when the evidence is substantially conflicting and contrary inferences can be drawn. (*Kirk* v. *Los Angeles Railway Corp.*, 26 Cal.2d 833, 837 [161 P.2d 673, 164 A.L.R. 1].) But if the evidence is legally insufficient to support a recovery the trial court should order a nonsuit. (*Zito* v. *Weitz*, 62 Cal.App.2d 161, 164 [144 P.2d 409].) Also, the court may grant the motion when, upon a consideration of the evidence in its most favorable aspect, it does not establish a prima facie case. The proof must be of a substantial character. (*Estate of Bryson*, 191 Cal. 521, 541

[217 P. 525].) It must be such that a reasonably intelligent person can fairly deduce from it that the fact alleged really does exist. (9 Cal.Jur. 554.) The court may also grant the motion when the evidence developed from the plaintiff so conclusively establishes a defense that the court might properly grant a new trial in case of a verdict in his favor upon like evidence. (*Nulsen* v. *Nulsen*, 3 Cal.App.2d 407, 409 [39 P.2d 509]; *Crebs* v. *Uplifters Country Home*, 133 Cal.App. 88, 95 [23 P.2d 807].)

### No Proof Contract Changed

█ If Emett had never agreed that the railroad premium was to be a part of appellant's contingency; if it was not suggested by either in any conversation held contemporaneously with the conferences with the railroad officials that it would be appellant's "incidental personal business"; if the latter made no protest at the absence from the summary statements sent him by respondent of any credit to him on account of the railroad's premium, then by what behavior of either Emett or appellant can it be adjudged that both agreed in February, 1939, or at any subsequent date (1) that any policy placed by respondents on a railroad, or (2) that any business solicited by respondents in which appellant should render aid as a loyal employee should constitute appellant's "incidental personal business"? Appellant testified that he had never agreed with respondent "on any percentage of commissions" that he should receive on the railroad's business. If the contract of employment did not clearly comprehend such a transaction as the railroad's insurance, and if there was never a specific agreement that appellant should have a percentage of the commission earned thereby, his contention that he is entitled to share in the commissions paid to respondents by the railroad is utterly without support.

### Appellant's Evidence Insufficient to Sustain a Judgment

█ Since the phrase "incidental personal business" is ambiguous the intention of the parties must be derived from the contemporaneous conversations and circumstances of the making of the agreement. (Civ. Code, § 1647; Code Civ. Proc., § 1860; *McIllmoil* v. *Frawley Motor Co.*, 190 Cal. 546, 552 [213 P. 971]; *Universal Sales Corp.* v. *California Press Manufacturing Co.*, 20 Cal.2d 751, 761 [128 P.2d 665].)

The statements of the parties as testified by the witness Drenth leave no doubt that they definitely intended that appellant was to devote his working hours to handling the corporation's accounts and to soliciting new business for it. While thus engaged surely they did not intend that appellant might spend weeks or even days in pursuit of personal clients and call upon respondent to bear the expense. A reasonable interpretation of his "incidental personal business" is that it should include only those items which came to him incidentally or casually through his personal connections without unduly invading the time and energies he was to devote to respondent's business. If such had not been their mutual intention would Emett have admonished him on February 9 against "chasing around after personal business," or would he have confined appellant's extracurricular activities by the remark "if you can produce an account without taking up too much of your time"? The agreement as to appellant's share of the commissions as established by his letter of February 11, 1939, is no proof that he is entitled to a share of the brokerage on the railroad policies unless his phrase can be rationally construed to include business acquired by respondent by the expenditure of only its own money and by the joint efforts of its officers and employees. If the agreement could be fairly construed to mean that appellant should receive one third of the commissions on the railroad business, then such construction would entitle appellant to 45 per cent of the brokerage on every policy sold through appellant as employee of respondent during office hours. Had they contemplated such a scheme surely the salary feature would have been omitted from the agreement, and commissions only would have been provided as appellant's compensation. There is no implication that the phrase "incidental personal business" of appellant includes all or any business solicited after office hours from newly acquired prospects.

Certainly business acquired through "leads" originating in the corporation's office could not be deemed either "personal" or "incidental" as contemplated by the contract. Prior to Coney's communicating to appellant the wish expressed to him by Cox, Coney had been in frequent contact with the office of the corporation. As an Aetna representative he wrote the railroad and thereby implied that he would introduce appellant as a representative of the corporation. It was not necessarily the fact of Coney's long acquaintance

with appellant that caused him to lead appellant to Cox and Herbert, but two other facts were of equal weight in effecting the meeting, namely: (1) Coney's periodic visits to the office of the corporation and (2) the latter's character and reputation. Neither appellant nor Coney had ever sold insurance to the other. Nor was either a business contact of the other prior to the transaction with the railroad.

The foregoing conclusions render unnecessary a discussion of other points raised by the parties in the two appeals.

The judgment in each case is affirmed.

McComb, J., and Wilson, J., concurred.