[Civ. No. 25251. Second Dist., Div. One. Oct. 3, 1961.]

ANTHONY DORIA, Appellant, v. INTERNATIONAL UNION, ALLIED INDUSTRIAL WORKERS OF AMERICA, AFL-CIO (an Unincorporated Association), Respondent.

Bertram S. Harris and Jerome Weber for Appellant.

Gilbert, Nissen & Irvin, R. W. Gilbert and W. B. Irvin for Respondent.

LILLIE, J.—Doria sued International Union on two promissory notes for $25,000 and $30,000, respectively; the union answered alleging lack of authority in the maker, conditional delivery, and want of consideration, and filed a cross-complaint to recover $25,000 and the value of a Cadillac automobile, and to cancel the two notes. Doria's answer set up consideration for the notes, the claim of conditional delivery to be violative

of the parol evidence rule, and estoppel. All matters were consolidated for trial. A jury was impaneled; after Doria rested his case a motion for nonsuit was granted. Proceeding on the cross-complaint the jury was waived; after brief testimony of a union witness, judgment was entered in the union's favor for $25,000 and value of a Cadillac, and canceling the two promissory notes. Doria appeals from the judgments of nonsuit and on the cross-complaint.

Defendant International Union is a national labor organization affiliated with AFL-CIO; Doria was secretary-treasurer and member of the executive board; Earl Heaton was its president. The union is governed by a constitution and laws, which Doria helped write. It provides that the international convention is "the supreme governing authority" and has plenary power to regulate and direct the policies, affairs and organization of the union (art. 5, § 2(a)); the executive board has much the same governing authority as the convention between sessions, but any board action is no longer final and binding if *reversed, set aside* or amended by the convention (art. 5, § 2(b)); between board sessions, the president has governing authority to regulate and direct the policies, affairs and organization of the union, "with the exception of *amending* or *countermanding* any order of the International Executive Board" (art. 5, § 2(c)), provided that any presidential action is no longer conclusive, final and binding if "*reversed, set aside* or amended" by the executive board, (art. 5, § 2(d)); and "between sessions of the Executive Board the President shall have full power to direct the workings of the organization and shall *report* his acts to the International Executive Board for its *approval*" (art. 13, § 6).

The rule on appeal from a judgment of nonsuit is stated in *Golceff* v. *Sugarman,* 36 Cal.2d 152 [222 P.2d 665], " '. . . that the court must view the evidence in the light most favorable to appellant, must disregard all inconsistencies and draw only those inferences from the evidence which can reasonably be drawn which are favorable to appellant' " (p. 153). With this in mind we summarize the lengthy evidence offered by Doria.

Between January 29 and February 7, 1957, Doria, then secretary-treasurer, participated in a series of meetings of the executive board in Miami, relative to an impending directive of the Ethical Practices Committee of the AFL-CIO to clean up corrupt practices in the union. Just prior to the first meeting Doria proposed to Heaton, then president, that

the union secure a restraining order, withdraw from the AFL-CIO and go independent. Doria was aware that "anything of that sort would have to be brought before the Board" because he "realized that any actions of the President or Secretary-Treasurer would have to be submitted to the Board for approval." The board rejected Doria's plan; then, inasmuch as Doria was the focal point of the AFL-CIO attack, he proposed he resign but in consideration of damages to compensate him for loss of his job and the slander to which he had been subjected. Doria insisted he negotiate a settlement at that time directly with the board; that approved by it, it "would be a final binding agreement." Doria still had three years left of his term as secretary-treasurer and proposed to the board that he step down in return for a seven-year contract of employment as union organizer for a total salary and expense account of $150,000 plus retention of existing benefits under the union pension program; the board approved this proposal on February 3, 1957. On February 4, Doria resigned his office to become effective March 1, 1957; however, immediately thereafter the AFL-CIO issued its directive giving the union 90 days to clean house or be subject to expulsion. It took the position that Doria, "the focal point of the attack" and against whom "most of the fire" was directed, had to be completely eliminated from the union. Thus, the February 3d arrangement had to be abandoned. Doria then discussed with Heaton a libel and slander suit against the AFL-CIO and the union rather than "trying to save face"; but they finally called the board back into session on February 6. Doria then secured from the board a substitute agreement rescinding the February 3d action and in lieu thereof proposed to the board that he would resign his membership and accept as a settlement $50,000 in cash, the Cadillac he was using and an agreement saving his pension rights; the board then and there approved all terms except that relating to the pension agreement which had to be worked out with the insurance company and required a vote of the pension committee. Doria testified that he knew any action transferring property of the union to him would require board approval. Heaton testified that when Doria asked who would handle "the final details . . . primarily referring to the pension," different individual board members expressed the opinion that he (Heaton) would have "to finish working out the details" in Los Angeles after the information relative to the position of the insurance company on the pension matter

becomes available. The agreement was to be finalized by March 1 when Doria's resignation would become effective.

Daily discussions between Heaton and Doria followed in Los Angeles. Heaton finally told him the pension arrangement had not been determined by the insurance company and that it was going to be impossible to ''work this pension thing out for him,'' and that relative to the $50,000 cash settlement, a problem arose concerning contributions from regional suborganizations. At first Doria rejected suggestions by Heaton about the possibility of modifying the Florida agreement or working out a compromise. Finally Doria ''decided that there could be no agreement worked out''; and told Heaton if he could not settle the pension matter he would not settle at all, that he wanted his February 4th resignation back and wanted Heaton to ''call a Board meeting''; he talked about a suit for libel and slander and said he did not want to deal with Heaton and felt he was getting the ''run around.'' Meanwhile, between February 6 and the 11th Heaton asked Doria for his resignation from union membership; finally he wrote Doria on February 11 demanding it but Doria did not tender it until February 19, at which time he told Heaton he was submitting his resignation in order to be in a position to sue the union for libel and slander for $1,000,000 based upon an article in the AFL-CIO ''News Reporter'' of February 9 and Heaton's letter to him of February 11, demanding his resignation (which was not ''published'' to a third person), without first having to exhaust the internal union procedures. Doria told Heaton he thought there was something wrong with respect to the action of the board and that he was going to proceed with the libel suit if ''they did not take action.'' Finally negotiations were reopened; Heaton proposed a cash settlement of $30,000 in addition to the $50,000; Doria would not accept it. However, later Doria approached Heaton and said he had thought the matter over and would accept the proposal.

On March 1, 1957, Doria's resignation became effective; thereafter they entered into an agreement providing for the additional $30,000 and the promissory notes. Heaton told Jewell (secretary-treasurer) he and Doria had concluded an agreement which contained ''$30,000 more,'' to which Jewell replied ''it was a lot of money and he wasn't sure it was the thing to do.'' The agreement designated ''Settlement Agreement and Release'' was entered into and signed on March 6,

five days after Doria had given up his office and membership in the union; the document was not then, or prior thereto, submitted to the board for union approval. The agreement provided for, and Doria did receive, a $25,000 check from the union funds which Doria cashed, two promissory notes of the union signed by Heaton as president—one for $25,000 payable June 1, 1957 (Exhibit 1), and the other for $30,000 payable 60 days after February 1, 1958 (Exhibit 2)—a total of $80,000, plus title to the Cadillac, and his vested pension rights. Thereafter on May 19, 1957, the executive board met in Washington where Heaton reported and submitted to it the settlement agreement and release; the board by formal action reversed and set aside the March 6 transactions between Heaton and Doria and the settlement was disapproved. On June 4, 1957, Doria presented the first promissory note for payment to Heaton; Heaton advised him no payment would be made on either note. Thereafter on August 8, 1957, at Ohio at the international convention a resolution was passed instructing the union to refuse payment on the notes and that proceedings be taken to obtain return of the $25,000 paid to Doria and title to the Cadillac.

Doria claims in his verified answer to the cross-complaint that the promissory notes were a portion of the $80,000 and a Cadillac agreed to be paid by the union "in settlement of the plaintiff's claim and cause of action in the sum of $1,000,000 sustained by plaintiff by reason of said International Union's deliberate, calculated and malicious defamation and libel and slander of the plaintiff on February 9, 1957, and on February 11, 1957 . . ." He also testified that he told Heaton in Los Angeles upon renegotiations that he was "only concerned with one thing and that was the settlement of a claim for libel and slander."

Doria himself testified that the settlement of March 6 and the promissory notes were the outgrowth of Heaton-Doria discussions in California after February 6, during which they concluded "an understanding with respect to modifying or changing the Florida settlement"; that he was conversant with the constitution and laws (Exhibit 4) which were mostly written by him, including specifically article 5, section 2(c), which expressly denies the president any authority for "amending or countermanding any order of the International Executive Board," section 2(d), which makes any action by the president "conclusive, final and binding unless and until reversed, set aside or amended" by the board, and article 13,

section 6, which requires the president to *"report* his acts to the International Executive Board for its *approval."*

Both Doria and Heaton testified relative to what they believed to be Heaton's authority for signing the promissory notes, check and ownership certificate to the Cadillac. It was Doria's opinion that the authority came from the February 6 agreement under which Heaton had complete authority "regardless of what it took" to finish the "details"; Heaton testified that he interpreted his authority to act between board meetings as being "subject to the approval of the Board at the next meeting" unless already directed by the board to take such interim action; that there was nothing in the constitution that gave finality to presidential action "without being subject to review or approval, or being set aside or reversed at the next meeting of the International Board"; that he acted under article 5, section 6(c) and (d), and thought he had been given authority by the board in Florida to "work out the details"; that while negotiating with Doria he was familiar with the constitution and laws and knew that the board could disapprove of anything he did since such settlement would be subject to approval of the executive board at the next meeting; and that he believed such settlement could not prejudice the rights of the union because it could be approved or disapproved by the board at its next meeting.

Viewing the evidence in the light of the rules applicable to nonsuits, we are persuaded that the judgment of nonsuit was proper; we are convinced there is in the record before us no evidence of sufficient substantiality to support a judgment for plaintiff if such judgment were given. (*Aguirre* v. *City of Los Angeles,* 46 Cal.2d 841 [299 P.2d 862].)

The evidence is clear that the board in Florida on February 6 approved in its final terms a settlement of $50,000 cash, the Cadillac and whatever pension arrangement Heaton could work out with the pension committee; that the details to be worked out related not to the cash settlement but to the pension arrangement; that the agreement renegotiated by Heaton and Doria, and subsequently entered into between them on March 6, was for an entirely new and different settlement, the terms of which provided for $80,000, $30,000 more than that previously approved by the board, and two promissory notes binding the union for a total of $55,000 to become due on June 1, 1957, and 60 days after February 1, 1958. There is no showing in the record that the board ever took

any action on the subject of the promissory notes or increased $30,000 settlement, or even contemplated the possibility of the same, at its meetings in January and February in Florida; nor does it show that the board ever expressly or impliedly authorized or approved or ratified Heaton's actions. On the contrary, it reveals, without contradiction, that Heaton was never authorized to modify or change the board action or enter into a new agreement; that in accord with the constitution and laws, Heaton thereafter duly reported his renegotiated settlement and execution of the notes to the board for its approval; that it expressly disapproved of the same, as subsequently did the international convention.

■ A trial court should order a nonsuit if the evidence, giving plaintiff benefit of full credit for all favorable evidence together with the reasonable inferences to be drawn therefrom (*Seaford* v. *Smith*, 86 Cal.App.2d 339 [194 P.2d 794]) is legally insufficient to support a recovery—if viewed in its most favorable aspect it does not establish a prima facie case. (*Morris* v. *Aerojet-General Corp.*, 183 Cal.App.2d 609 [6 Cal.Rptr. 906] ; *Meadows* v. *Emett & Chandler*, 86 Cal.App.2d 1 [193 P.2d 785].) ■ The fact that the evidence is conflicting does not deprive the trial court of the right to exercise its power (*Rufo* v. *N.B.C. National Broadcasting Co.*, 166 Cal.App.2d 714 [334 P.2d 16]) as long as the conflict is not a substantial one. (*Meadows* v. *Emett & Chandler*, 86 Cal. App.2d 1 [193 P.2d 785].) ■ Although cautioned by the trial judge that all he was required to do to present a prima facie case was to offer the promissory notes (Exhibits 1 and 2) and rest on the usual presumptions created by the law of negotiable instruments (Civ. Code, §§ 1614, 3097; Code Civ. Proc., § 1963, subds. 21, 39; *Henderson* v. *Drake*, 118 Cal. App.2d 777 [258 P.2d 879]), Doria chose to affirmatively establish the authority of the maker, delivery, and consideration for the notes, by introducing the settlement agreement and release (Exhibit 3), Constitution and Laws of International Union (Exhibit 4) and the extensive testimony of various witnesses. Thus, Doria assumed the burden of establishing the elements of his action on the two notes (*Rufo* v. *N.B.C. National Broadcasting Co.*, 166 Cal.App.2d 714 [334 P.2d 16]) ; if he failed to sustain it and his evidence lacks the essential elements of proof, as a matter of law there is no evidence of sufficient substantiality to support a judgment for him. Doria having chosen to proceed as he did, had the burden of establishing among other things, the maker's author-

ity (*Cignetti* v. *American Trust Co.*, 139 Cal.App.2d 744 [294 P.2d 490]); thus, unless Doria's case includes substantial evidence which would support a finding that Heaton, who signed the notes as president of the union, had authority to bind it by executing and delivering the same to Doria, the judgment of nonsuit must be affirmed. We say that it does not.

Appellant relies upon various inferences and general code presumptions to create a conflict in the evidence. However, there appear in the case certain special presumptions in negotiable instrument and agency law, and the testimony of certain plaintiff witnesses, which dispel those relied upon by appellant (*Walsh* v. *American Trust Co.*, 7 Cal.App.2d 654 [47 P.2d 323]; *Estate of McConnell*, 6 Cal.2d 493 [58 P.2d 639]) and render the evidence not "sufficient to support a logical inference" as to Heaton's authority to make, execute and deliver the notes on behalf of the union. ▆ For the evidence to be of sufficient substantiality to make a judgment for nonsuit improper, "[i]t must be such that a reasonably intelligent person can fairly deduce from it that the fact alleged really does exist" (*Morris* v. *Aerojet-General Corp.* 183 Cal.App.2d 609, 613 [6 Cal.Rptr. 906]); it " 'must be sufficient to raise more than a mere conjecture or surmise that the fact is as alleged.' (*O'Connor* v. *Mennie*, 169 Cal. 217, 222 [146 P. 674].) " (*Alves* v. *Lopez*, 159 Cal.App.2d 705, 707 [324 P.2d 652]; *Bravo* v. *Sharkey*, 97 Cal.App.2d 883 [218 P.2d 785].)

▆ Further, a nonsuit is properly granted when evidence developed from the plaintiff's case so conclusively establishes a defense that the court might properly grant a new trial in case of a verdict in his favor upon like evidence. (*Meadows* v. *Emett & Chandler*, 86 Cal.App.2d 1 [193 P.2d 785]; *Nulsen* v. *Nulsen*, 3 Cal.App.2d 407 [39 P.2d 509]; *Crebs* v. *Uplifters Country Home*, 133 Cal.App. 88 [23 P.2d 807].)

Appellant's points urging reversal of the judgment on the cross-complaint are both numerous and extended, but his main complaint seems to be that the evidence is insufficient to support the findings and the trial court erred in not applying the parol evidence rule and the rule of estoppel.

▆ He controverts the findings that on February 6, the board approved an understanding whereby Doria agreed to resign and surrender his salary of $15,000 a year for the three years remaining of his term as secretary-treasurer, and

the union would pay him $50,000 cash and transfer title to a 1956 Cadillac and he would be allowed to retain his vested pension rights (XII), and the board did not then expressly or impliedly authorize Heaton to enter into any settlement agreement with Doria, including specifically that of March 6, 1957 (XIII), to make, execute and/or deliver to Doria any promissory notes (XIV), or to enter into the settlement of any litigation, including specifically any alleged cause of action for libel and slander (XV); that on February 19, Doria informed Heaton he would not abide by the understanding of February 6 and would not accept the $50,000 cash and Cadillac (XVI); that on February 19 he resigned as a member effective March 1, for the purpose of placing himself in a position to sue the union without first being required to exhaust his internal remedies, and threatened Heaton that unless the understanding of February 6 was renegotiated he would bring suit against the union for $1,000,000 for libel and slander upon statements about him in the "A.F.L.-C.I.O. News Reporter" on February 9 and made by Heaton in his letter of February 11 to Doria demanding his resignation as a union member, but not "published" to any third person (XVIII); and that on May 18, 1957, the board reversed and set aside the transactions of March 6 (XXIV), and on August 8, 1957, the convention instructed officers of the union to refuse payment on the notes and sue for the return of the $25,000 and the value of the Cadillac.

When the nonsuit was granted, cross-complainant rested on the record as it then stood except for the introduction of several documents and the brief testimony of one witness. Inasmuch as the evidence is little different from that received on Doria's case-in-chief, as hereinabove summarized, we refrain from recounting the same. However, a reading of the entire record demonstrates that the evidence and the inferences to be drawn therefrom are sufficient to and do sustain the findings of fact and conclusions of law made by the lower court, and the findings support the judgment.

▮▮▮ Appellant again, at length and interminably, argues matters of authority in the maker, consideration and delivery. He says Heaton was not acting as president but as "agent" of the board when he signed and delivered the two promissory notes, in that he was directed to "work out the details." Factually the record does not support the agency theory. First, it was not board action under which Heaton tried to work out the details—but expressions of individual board

members; second, the reference was made to working out details of the "pension thing," not the cash settlement which had been wholly approved in its final terms by the board in Miami; and third, the promissory notes were *not* given in accord with the February 6 settlement approved by the board, but pursuant to that of March 6; thus their execution and delivery could not possibly constitute a "detail" of the February 6 understanding. In Miami the board had agreed upon the final terms of, and given its approval to, the February 6 settlement; concerning this there was nothing "to work out"; the only matter the board could not, and did not then approve was the pension arrangement which involved a determination of the pension committee which would entitle him to "early retirement," and arrangements between Doria and the insurance carrier as to the amount and mode of payment. To say that Heaton was in any way authorized to, or that the board even contemplated he would, add to the already approved settlement new and different terms, especially requiring an additional $30,000 and two promissory notes to bind the union, or amend or countermand the board's action, is to completely ignore the evidence. And definite proof of Heaton's lack of authority, as "agent" or president, lies in the board's subsequent action of May 19, reversing and setting aside the March 6 settlement. The evidence is clear that the board did not on February 6, or at any other time, authorize Heaton, as president, or its agent, either expressly or impliedly, to enter into a completely new and separate agreement to pay Doria $80,000 and execute two promissory notes; nor did the constitution and laws permit Heaton to "amend" or "countermand" any order of the board (art. 5, § 2(c)), or permit him to act without reporting it to and approval by the board (art. 13, § 6). In any event, Heaton's acts have no validity because the board subsequently "reversed and set aside" the "deal" of March 6, and thereafter the international convention as the "supreme governing authority" disapproved the same. Doria failed to sustain his burden of proving either agency and the scope of the agent's authority (*Walsh* v. *American Trust Co.*, 7 Cal.App.2d 654 [47 P.2d 323]; *Aspen Pictures, Inc.* v. *Oceanic S. S. Co.*, 148 Cal.App.2d 238 [306 P.2d 933]), or that Heaton acted under authority of the board.

Nor can appellant rely upon the "$50,000 settlement" approved by the board February 6 to support the $25,000 cash payment and transfer of the Cadillac. The evi-

dence shows that Heaton and Doria, at the latter's instance renegotiated the settlement after having abandoned that of February 6. When the pension arrangement could not be worked out, Doria decided there could be no agreement; he said he wasn't going to go along "with just part of it" and "let the rest go," and would not accept the understanding of February 6. In fact, he tendered his resignation from union membership in order to place himself in a position to sue the union, and threatened Heaton that unless the understanding of February 6 "was renegotiated he would bring a legal action" against the union for a million dollars for libel and slander. Moreover, Doria admitted that the March 6 settlement and promissory notes were the outgrowth of Doria-Heaton discussions in which they discussed and concluded "an understanding with respect to modifying or changing the Florida settlement" to include the $30,000 additional and the two promissory notes. There can be no question but that the March 6 settlement was an entirely new contract, different in its terms from the one approved by the board on February 6. ▮▮▮▮ Whether the latter had been abandoned was for the trial court and a finding thereon will not be disturbed on appeal if there is any substantial evidence to support it (*Honda* v. *Reed,* 156 Cal.App.2d 536 [319 P.2d 728]); such "[a]bandonment . . . may be implied from the acts of the parties in negotiating for a new and different contract concerning the same property or subject matter. [Citations.]" (P. 539.)

▮▮▮▮ The trial court properly concluded that both notes were given to Doria subject to the express condition contained in the constitution and laws—that the board must approve the transaction before any arrangement concerning the notes could become final and the instruments binding on the union. And Doria, an officer and member of the board, well knew the limitations of the president between board meetings; he had been the principal draftsman of the constitution and laws; he, on various occasions during negotiations, acknowledged that any action of the president would have to be submitted to the board for approval, including the transfer of any union property; he was also present at the January and February board meetings and knew what approval had been given; and he realized the inability of Heaton to finalize any *new* action, for in Los Angeles after he decided there could be no agreement, he told Heaton he wanted to "*call a Board meeting.*" ▮▮▮▮ As between immediate parties,

the delivery of a negotiable instrument in order to be effectual must be made either by or under the authority of the party making same; and a note on its face apparently binding in its terms may be shown to have been conditionally delivered under section 3079, Civil Code, which provides that every contract on a negotiable instrument is incomplete and revocable until delivery. (*Ellington* v. *Pacific Coast P. & P. Corp.*, 135 Cal.App. 703 [28 P.2d 404], *Borgonovo* v. *Henderson*, 182 Cal.App.2d 220 [6 Cal.Rptr. 236].) Having transferred the two notes without authority of the board, under circumstances that make it clear its approval was a condition precedent to valid delivery, and no approval or ratification of the board forthcoming, Heaton effected neither a valid execution nor delivery of the notes to Doria. Thus on another ground the instruments never became binding obligations of the union. (*Wilson* v. *Bramblett*, 151 Cal.App.2d 369 [311 P.2d 22].) Considering Doria's position with the union, his activities, his familiarity with the constitution and laws and his conduct with Heaton, it would be difficult to argue that he did not take the risk in accepting the notes, the $25,000 and transfer of the car (*Ernst* v. *Searle*, 218 Cal. 233 [22 P.2d 715]); and if, according to his contention he thought he was dealing with Heaton as the board's agent, he not only took that risk but it was incumbent upon him to "inquire as to the extent of his [agent's] authority." (*Cignetti* v. *American Trust Co.*, 139 Cal.App.2d 744, 749 [294 P.2d 490].)

 Moreover, the trial court was correct in concluding that there was want of consideration for the notes and the March 6 transaction of which they were a part. While the notes specify on their face they were "for value received," and the "Settlement Agreement and Release" of March 6 suggests that the consideration for the $80,000 settlement was not only Doria's forbearance to sue but his elimination from office and termination from membership, the evidence and Doria's own verified pleading support the trial court's implied finding that the only consideration was the settlement of his threatened million-dollar damage action for libel and slander arising from the "A.F.L.-C.I.O., News Reporter" article of February 9 and Heaton's letter of February 11. Heaton testified that neither the February 3d nor 6th actions of the board had anything to do with whether Doria sued for libel and slander; indeed the February 9th article and February 11th letter had not yet come into being. The settle-

ment of March 6 was actually entered into five days after Doria's resignations from office and union membership became effective. After Doria and Heaton abandoned the February 6 understanding, negotiations for the new settlement centered around his proposed suit for libel and slander; in fact, Doria told Heaton during that time he was "only concerned with *one thing* and that was the settlement of a claim for libel and slander." Further, in submitting his resignation from membership on February 19, Doria specifically mentioned that he was tendering it for the purpose of placing himself in a position to sue the union based upon the February 9th article and Heaton's letter; and he threatened to proceed with the suit if "they" did not take action and renegotiate a settlement. Moreover, this is borne out by Doria's verified pleading in which he alleges that the promissory notes were part of an $80,000 transaction "in settlement of plaintiff's claim and cause of action" for damages sustained by reason of the union's "deliberate, calculated and malicious defamation and libel and slander of plaintiff" on February 9 and 11. (Answer to cross-complaint. Par. II.)

The trial court concluded, and it is supported by the law of this state, that Doria's claim for damages for libel and slander were sham and frivolous. The article in the "News Reporter" was a privileged publication relating to union policies and administration and falls within the recognized area of permissible fair comment without civil responsibility in damages. (*Emde* v. *San Joaquin County, Central Labor Council*, 23 Cal.2d 146 [143 P.2d 20, 150 A.L.R. 916]; *Jeffers* v. *Screen Extras Guild, Inc.*, 162 Cal.App.2d 717 [328 P.2d 1030]; *Krause* v. *Bertrand*, 159 Cal.App.2d 318 [323 P.2d 784]; *De Mott* v. *Amalgamated Meat Cutters*, 157 Cal.App.2d 13 [320 P.2d 50].) Heaton's February 11 letter to Doria was not "published" to any third person and appears to have been unactionable. (*Farr* v. *Bramblett*, 132 Cal.App.2d 36 [281 P.2d 372]; *Shoemaker* v. *Friedberg*, 80 Cal.App.2d 911 [183 P.2d 318].) ▆▆▆ A release or agreement to forbear to sue on sham and unfounded causes cannot constitute valid legal consideration. (*Goldner* v. *Jaffe*, 171 Cal.App.2d 751 [341 P.2d 354]; *City Street Improvement Co.* v. *Pearson*, 181 Cal. 640 [185 P. 962, 20 A.L.R. 1317]; *Blyth* v. *Robinson*, 104 Cal. 239 [37 P. 904].)

▆▆▆ Appellant's contention that the parol evidence rule bars the assertion of the defenses of lack of authority to make, execute or deliver the promissory notes, conditional

delivery and lack of consideration, is equally without merit. The union's answer, alleging these defenses, places in issue the validity of the two notes; the union's sole claim was that they are not valid and cannot bind the union. Section 1856, Code of Civil Procedure, relied upon by appellant to the effect that there can be "no evidence of the terms of the agreement other than the contents of the writing" expressly does not apply "2. Where the validity of the agreement is the fact in dispute" (§ 1856).

The absence of consideration is always a defense to a suit on a promissory note (Civ. Code, § 3109) and since an instrument lacking in consideration is invalid, this fact may be shown by extrinsic evidence (Code Civ. Proc., § 1856, subd. 2; *Harper* v. *French*, 29 Cal.App.2d 214 [84 P.2d 216]). Contending the contrary, appellant cites *Harding* v. *Robinson*, 175 Cal. 534 [166 P. 808]; *Koeberle* v. *Hotchkiss*, 4 Cal.App.2d 252 [40 P.2d 911]; and *Mulholland* v. *Parker*, 26 Cal.App.2d 107 [78 P.2d 1045], which generally hold that where an instrument recites executory promises of the parties, extrinsic evidence cannot be received to vary or add to them. But this is not here the situation; no attempt was made by the union to change or alter the promise in each note ("for value received," to pay to Doria the sum stated therein). The notes recite only executed consideration, nothing else.

"Parol evidence is admissible to contradict a recital of *executed consideration*, i.e. money, property or services which the contract states have been received" (Witkin, California Evidence, p. 407); and the "failure of consideration, or actual consideration, for a contract may be proved by parol evidence although a different consideration appears in writing." (*Sandrini* v. *Branch*, 32 Cal.App.2d 707, 708 [90 P.2d 593]; *Kent* v. *First Trust & Sav. Bank*, 101 Cal.App.2d 361 [225 P.2d 625]; *Richardson* v. *Lamp*, 209 Cal.668 [290 P. 14].)

In support of his claim that extrinsic evidence was not admissible to establish lack of Heaton's authority to make, execute and deliver the notes and the agreement, appellant offers no authority or argument.

Parol evidence is always admissible as between the original parties to a promissory note to establish there was no delivery or that it was conditional; such testimony does not vary or contradict the terms of the note. (*Harper* v. *French*, 29 Cal.App.2d 214 [84 P.2d 216].) The condition here was approval of the board; delivery of the notes was

contingent upon that approval; thus, the entire transaction was inchoate and of no legal effect until the condition was satisfied. If there was no board approval there was no binding obligation, and delivery of the notes was ineffectual; parol evidence showed, not that there was a different agreement, but that there was no binding contract in the first instance. This is not the situation shown in the cases cited by appellant (*Hanrahan-Wilcox Corp.* v. *Jenison Machinery Co.*, 23 Cal. App.2d 642 [73 P.2d 1241]; *Van Fleet-Durkee, Inc.* v. *Oyster,* 91 Cal.App.2d 411 [205 P.2d 32]; *McArthur* v. *Johnson,* 216 Cal. 580 [15 P.2d 151]; *Stafford* v. *Russell,* 117 Cal.App.2d 326 [255 P.2d 814]), in which an attempt was made to show that one or more of the terms of the instrument was conditional. Here the union sought to, and did, establish by extrinsic evidence that the delivery of the entire instruments themselves was contingent on the satisfaction of the condition—approval of the board; and that the condition did not happen. The parol evidence rule did not bar proof of conditional delivery.

 Appellant claims the union was estopped to raise the defenses of lack of authority in the maker, conditional delivery and want of consideration and that the trial court erred in not applying the statutory presumption contained in section 1962, subdivision 3, Code of Civil Procedure.

While in the instant situation the question of estoppel is one of fact for the determination of the trial court (*Goldstein* v. *McNeil,* 122 Cal.App.2d 608 [265 P.2d 113]) Doria, asserting the bar, had the burden of proving all the elements constituting estoppel (*Bear Creek Co.* v. *James,* 115 Cal.App.2d 725 [252 P.2d 723]); and since estoppel is not favored and must clearly be proved (*Lorenz* v. *Rousseau,* 85 Cal.App.1 [258 P. 690]; *Newman* v. *Albert,* 170 Cal.App.2d 678 [339 P.2d 588]), it will not be enforced unless substantiated in every particular. (*Johnson* v. *Johnson,* 179 Cal.App.2d 326 [3 Cal.Rptr. 575].) ''Four things are essential to the application . . . of equitable estoppel. They are: 1. There must have been a misrepresentation or concealment of the matters of fact as to which the estoppel is claimed; 2. The party to be estopped must intend that the other party act upon the assumption of the truth of that fact; 3. The party claiming the estoppel must be ignorant of the true facts; 4. He must rely to his injury upon the conduct of the party to be estopped.'' (*Banco Mercantil* v. *Sauls, Inc.,* 140 Cal.App.2d

316, 323 [295 P.2d 55]; *Argonaut Ins. Co.* v. *Industrial Acc. Com.*, 190 Cal.App.2d 392, 399 [12 Cal.Rptr. 71].)

There is nothing in the record before us upon which to base an estoppel *in pais*. The evidence does not support any finding of misrepresentation or concealment by the union; the showing of Doria's position with the union, his knowledge of union affairs, his familiarity with the constitution and laws and his conduct during the transactions in question, defeats any argument that he was ignorant of the true facts; and Doria, in entering into the March 6 settlement certainly did not rely upon any conduct of the union, even though he dealt with Heaton. On appeal where the evidence is sufficient to support an inference by the trial court that no estoppel existed its findings will not be disturbed on appeal. (*Roven* v. *Miller,* 168 Cal.App.2d 391 [335 P.2d 1035].)

Nor is there merit to appellant's argument relative to "unjust enrichment." He claims that in canceling the transaction, the union should have offered to reinstate Doria, return his "release" and waive the statute of limitations for the filing of his complaint for libel and slander. Actually Doria's resignations from office and membership became effective before the March 6 settlement; they were tendered long before negotiations for the March 6 settlement were entered into and moreover were on his own volition and admittedly for personal reasons, not to benefit the union (he resigned from membership to sue the union); and the trial court found, and properly so, that Doria's resignations were not given in consideration of the settlement of March 6. The forbearance to sue on the alleged libel and slander causes did not constitute any benefit to the union inasmuch as they were patently sham and frivolous; and Doria himself permitted the statute of limitations to run in connection with his alleged defamation actions. The alleged utterances were made on February 9 and 11, 1957; on June 14 he was told neither note would be paid; Doria had until at least February 9, 1958, in which to file a complaint against the union for libel and slander. The evidence does not support any finding that the union received any benefit as the result of the March 6 agreement and, upon cancellation of the same, had nothing of value to restore. (*Simmons* v. *California Institute of Technology,* 34 Cal.2d 264 [209 P.2d 581]; *Watson* v. *Poore,* 18 Cal.2d 302 [115 P.2d 478].)

Finally appellant says the trial court deprived him of his property rights without due process of law in violation of his constitutional rights, in that during the presentation of his case-in-chief the trial court would not then permit evidence relative to estoppel. A true reading of the record discloses no denial of any right; that the trial court intended only to, and did, regulate the order of proof; and that the judge made it clear that such evidence was for rebuttal only if defendant produced evidence in support of its cross-complaint. When the cross-complaint rested, the court then asked appellant if he had "any rebuttal"; Doria's counsel responded: "That is all, your honor. The cross-defendant rests" and offered no rebuttal evidence. He cannot now complain. (*Rinehart* v. *First Cupertino Co.*, 154 Cal.App.2d 842 [317 P.2d 30]; *Ford* v. *Carew & English*, 89 Cal.App.2d 199 [200 P.2d 828].)

Further points raised by appellant are without merit and fail to justify extension of this opinion.

For the foregoing reasons the judgments are affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 29, 1961.