[No. A049833. First Dist., Div. Four. July 22, 1991.]

INA RUTH PERKINS, Plaintiff and Appellant, v.
TIMOTHY HOWARD, Defendant and Respondent.

## COUNSEL

Kurahara & Morrissey, Michael T. Morrissey and Joseph R. Kafka for Plaintiff and Appellant.

LaFollette, Johnson, DeHaas & Fesler, John L. Supple and Peter Theophilos for Defendant and Respondent.

## OPINION

**POCHÉ, Acting P. J.**—Plaintiff and appellant, Ina Ruth Perkins, appeals from a summary judgment in favor of defendant and respondent, Timothy Howard, M.D., in this action for medical malpractice. At issue is whether the trial court properly determined that Business and Professions Code section 2396, one of California's numerous "Good Samaritan" statutes, immunized Dr. Howard from civil liability when he responded to a call from a hospital to render emergency assistance to another orthopedic surgeon during appellant's surgery. We conclude that Dr. Howard established his entitlement to immunity as a matter of law and affirm.

### THE EVIDENCE

On June 2, 1988, appellant underwent elective total hip replacement surgery at Mt. Diablo Medical Center. Dr. John Lang was the surgeon; Dr. Clyde O'Neill was scheduled to be the assistant surgeon. Prior to the operation, Dr. O'Neill alerted Dr. Lang in a telephone conversation that he believed he was coming down with the flu. Dr. Lang said "it would be difficult to get another assistant surgeon at that late hour" and that he hoped Dr. O'Neill would feel well enough to assist him. Dr. O'Neill said he would attempt to assist in the 7:30 a.m. surgery.

He did, but at some point early in the surgery, Dr. O'Neill became so ill that he had to lie down on the operating floor.[1] He later left the room. The hospital contacted Dr. Howard, who was seeing patients at his office across the street, and asked if he would "step in as assistant surgeon and complete the ongoing surgery" with Dr. Lang. Dr. Howard cancelled his remaining appointments and went to the hospital to assist in the surgery.

After the surgery, appellant suffered "severe pain, numbness and inability to move" areas of her left foot, ankle and leg. It is alleged that these conditions were the result of a sciatic nerve injury during surgery. It is undisputed that Dr. Howard "did not commit any willful act or omission" while assisting Dr. Lang.

REVIEW

A.

The three-step standard governing review of a motion for summary judgment (Code Civ. Proc., § 437c) can be summarized as follows.

■ Because a motion for summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, the appellate court must independently review them on appeal and apply the same three-step analysis required of the trial court. First, the issues as framed by the pleadings must be identified as it is those allegations to which the motion must respond by establishing a complete defense or by showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. Secondly, it must be determined whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. The motion must be self-sufficient: it cannot succeed because of a weak opposition, and it must disprove even those claims on which the opponent would have the burden of proof at trial. If the motion prima facie justifies a judgment in the moving party's favor, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. Counteraffidavits and declarations need not prove the opposition's case; they suffice if they disclose the existence of a triable issue. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)

---

[1] According to Dr. O'Neill this was some 15 minutes after the initial incision had been made and before the hip joint had been exposed. Dr. Howard could not remember at what stage of the surgery he entered. Dr. Lang could not recall at what point Dr. O'Neill became so sick that he could not perform: "to the best of my recollection, we're down to the hip joint."

■ The moving party's affidavits are to be strictly construed, those of the opposing party are liberally construed, and doubts as to the propriety of the motion are to be resolved against the moving party. (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35-36 [210 Cal.Rptr. 762, 694 P.2d 1134].) Similarly, all conflicts in the affidavits are to be resolved in favor of the opposing party (*Gregorian* v. *National Convenience Stores, Inc.* (1985) 174 Cal.App.3d 944, 946 [220 Cal.Rptr. 302]) and all reasonable inferences are to be drawn in favor of that party as well. (*Rubio* v. *Swiridoff* (1985) 165 Cal.App.3d 400, 403 [211 Cal.Rptr. 338].) Mere conclusions of law or fact are insufficient to satisfy the evidentiary requirements for a summary judgment statute, nor may it be based upon inferences which are contradicted by other inferences. (*Ahrens* v. *Superior Court* (1988) 197 Cal.App.3d 1134, 1141 [243 Cal.Rptr. 420].)

With these standards in mind, we review the granting of defendant's motion for summary judgment.

B.

California has a goodly number of Good Samaritan statutes which protect designated classes of people from civil liability for their acts or omissions when rendering emergency assistance.[2] They vary greatly in their requirements.

We confine our inquiry to the one at issue here: Business and Professions Code section 2396.[3] It confers immunity upon a physician[4] who at the

---

[2](See, e.g., Bus. & Prof. Code, §§ 2395, 2396 [physicians and podiatrists]; (§ 2398 [physicians and podiatrists attending a community college or high school athletic event]; § 1627.5 [dentists]; § 2727.5 [registered nurses]; § 2861.5 [licensed vocational nurses]; Health & Saf. Code, § 1799.104 [physician or nurse giving emergency instructions to an EMT or a mobile intensive care paramedic; EMT's or mobile intensive care paramedic following those instructions]; Health & Saf. Code, § 1317 [rescue team members]; Health & Saf. Code, § 1799.102 [anyone]; Health & Saf. Code, § 1799.106 [firefighters, police officers, EMT's]; Health & Saf. Code, § 1799.108 [anyone certified in prehospital emergency field care treatment]; Health & Saf. Code, § 27637 [anyone trying to remove food stuck in throat of person in a restaurant]; Veh. Code, § 165.5 [rescue team with an emergency vehicle]; Civ. Code, § 1714.2 [anyone trained in and who performs cardiopulmonary resuscitation]; Gov. Code, § 50086 [anyone asked by governmental authorities to assist in a search and rescue operation]; Harb. & Nav. Code, § 656 [anyone giving aid at a boating accident or collision].)

[3]Business and Professions Code section 2396 provides in full: "No licensee, who in good faith upon the request of another person so licensed, renders emergency medical care to a person for medical complication arising from prior care by another person so licensed, shall be liable for any civil damages as a result of any acts or omissions by such licensed person in rendering such emergency medical care."

Unless otherwise indicated, all statutory references are to the Business and Professions Code.

[4]To be more precise, the statute confers immunity on any "licensee" responding to the call for aid by another "licensee" (§ 2396). A licensee within the meaning of section 2396 is the

request of another physician and "in good faith" "renders emergency medical care to a person for medical complications arising from" the prior care by the requesting physician. Parsed, the elements of section 2396 are as follows:

First the party entitled to its protection must be a licensed physician. (See fn. 4, *ante.*)

Second, the physician must "render emergency medical care" at the request of another physician "for medical complications arising from" the requesting physician's prior medical care. The location at which the care is given is irrelevant.[5] Nor does section 2396 define or in any way limit what can be considered "emergency medical care."

Third, the physician must act in "good faith." Curiously enough, no additional standard of care is imposed.[6] Thus the goodness of the Samaritan is a description of the quality of his or her intention, not the quality of the aid delivered. (See Mapel & Weigel, *Good Samaritan Laws—Who Needs Them?: The Current State of Good Samaritan Protection in the United States* (1981) 21 S. Tex. L.J. 327, 338.)

Although these are the only requirements for immunity the statute mentions case law has developed a fourth: the absence of a preexisting duty of professional care to the patient. (See e.g., *Street* v. *Superior Court* (1990) 224 Cal.App.3d 1397, 1402 [274 Cal.Rptr. 595]; *Kearns* v. *Superior Court, supra,* 204 Cal.App.3d at p. 1329; *Burciaga* v. *St. John's Hospital, supra,* 187 Cal.App.3d 710, 716; see generally, Annot., Good Samaritan Statutes (1980) 68 A.L.R.4th 294, §§ 12, 15.) This addition is so well accepted in California that one court has described it as the "*heart* of the application of the Good Samaritan statutes." (*Burciaga* v. *St. John's Hospital, supra,* 187 Cal.App.3d 710, 716, italics added; accord *Kearns* v. *Superior Court, supra,* 204

---

holder of either a physician's and surgeon's certificate or a podiatrist's certificate (see § 2041). For simplicity, we shall use the term physician rather than licensee, and in using that term we mean it to be interchangeable with podiatrist.

[5]For example, emergency medical care may be given in a hospital. (*Kearns* v. *Superior Court* (1988) 204 Cal.App.3d 1325, 1329 [252 Cal.Rptr. 4]; *Burciaga* v. *St. John's Hospital* (1986) 187 Cal.App.3d 710, 716 [232 Cal.Rptr. 75]; *McKenna* v. *Cedars of Lebanon Hospital* (1979) 93 Cal.App.3d 282, 286 [155 Cal.Rptr. 631].)

[6]Section 2396 is not the only Good Samaritan statute in California which requires only good faith. (See also § 1627.5; Health & Saf. Code, §§ 1799.102, 1317; Gov. Code § 50086; Veh. Code, § 165.5 [each requiring only good faith on the part of the protected class of Good Samaritans].) By contrast, other Good Samaritan statutes require good faith but exempt from their protection willful acts or omissions (§ 2395) or grossly negligent acts (see §§ 2398, 2727.5, 2861.5; Health & Saf. Code, §§ 1799.106; Civ. Code, § 1714.2) or specifically require the Good Samaritan to act in a non-negligent manner (see Health & Saf. Code, § 27637; Harb. & Nav. Code, § 656, subd. (b).)

Cal.App.3d at p. 1329.) Since the existence of a preexisting duty of care is not mentioned in section 2396 or in any other Good Samaritan statute in this state we doubt the Legislature meant it to be the "heart of" much less an element of the immunity. But because the point seems well settled and is not challenged by the parties here, we will assume at least for purposes of analysis that it is a requirement.

Thus to recap, in order to be entitled to a summary judgment premised upon the complete defense of immunity under section 2396 for his acts or omissions during appellant's surgery, Dr. Howard was required to establish: (1) that he was a licensed physician; (2) that he rendered "emergency medical care" at the request of another physician for medical complications arising from prior care by the requesting physician; (3) that he acted in "good faith"; and (4) he did not have a preexisting duty of professional care to appellant.

In turn, in order to defeat Dr. Howard's motion, appellant was required to show the existence of a triable issue of fact on any one of these elements. She focused her attack below on two elements: (1) that Dr. Howard did not render "emergency medical care"; and (2) that Dr. Howard had a pre-existing duty of care to her. Her aim remains the same on appeal. We thus confine our discussion to those elements.

## C.

Because section 2396 does not define emergency medical care, the cases have supplied one by drawing on the definition which is used as a defense to a charge of unlicensed or authorized practice of law (see e.g. *Newhouse* v. *Bd. of Osteopathic Examiners* (1958) 159 Cal.App.2d 728, 735 [324 P.2d 687]). "Emergency" is thus defined as an " 'exigency of so pressing a character that some kind of action must be taken.' " (*Id.* at p. 735; *Colby* v. *Schwartz* (1978) 78 Cal.App.3d 885, 891, fn. 6 [144 Cal.Rptr. 624] [interpreting the predecessor statutes former §§ 2144, 2144.5]); accord *Kearns* v. *Superior Court, supra,* 204 Cal.App.3d 1325, 1328.)

Under that test, Dr. Howard performed emergency medical care when he aided Dr. Lang on appellant's surgery. Although there was some difference of opinion as to the precise point in the incision-making process at which Dr. O'Neill collapsed (see fn. 1, *ante*), respondent's uncontradicted evidence established that both completion of the surgery and the assistance of a second surgeon were necessary to protect the appellant's health.[7] Because

---

[7]According to Dr. Lang "Whenever you go back on the second time on an incision you're taking [an] increased chance of infection." Dr. Howard agreed: "Every time a patient is put

she introduced no conflicting evidence on these points, appellant failed to demonstrate the existence of a triable factual issue on whether the circumstances created an " 'exigency of so pressing a character that some action had to be taken.' " Summary adjudication on the issue of emergency medical care was therefore proper. (Cf. *Burciaga* v. *St. John's Hospital, supra*, 187 Cal.App.3d 710, 714 [no triable issue where plaintiff failed to present counteraffidavits disputing defendants' evidence demonstrating an emergency existed].)

Not content with an analysis that stops here, appellant attempts to add yet another hurdle for immunity under section 2396: that the medical necessity requiring the assistance of another physician be caused by an unforeseen complexity. Appellant finds this new element in *Kearns* v. *Superior Court, supra*, 204 Cal.App.3d 1325. We do not.

In *Kearns*, a surgeon who was unable to remove a malignant ovarian tumor called for assistance. Another surgeon, who happened to be in the hospital treating his own patients, responded. During the remainder of the procedure, the contents of the tumor spilled into the patient's stomach. Once she got out of the hospital, she sued, among others, the responding physician.

In finding the responding physician immune from liability, the Court of Appeal repeated word for word and with appropriate citation the standard test of an emergency we have relied upon here " ' " ' . . . where the exigency is of so pressing a character that some kind of action must be taken . . . .' " ' " (*Kearns* v. *Superior Court, supra*, 204 Cal.App.3d at p. 1328.) It did so without any hint of criticism of that standard and then applied that test to the facts before it in these words: "Where, as here *unexpected complications* during surgery produce a pressing necessity requiring immediate intraoperative assistance during a critical stage of the operation, an emergency

---

under general anesthesia that patient is at risk of suffering severe injury or death. [¶] Every time an incision is made on a patient, during a surgical procedure, the incision carries with it the risk of infection. [¶] In my opinion, it was in the patient's best interest to continue with surgery once surgery has been commenced and that in this case proceeding with plaintiff's surgery once Dr. O'Neil [*sic*] became too ill to continue, was in the patient's best interest since terminating the surgery and undertaking the surgery again at a later time, carried with it the risk of infection, serious injury or death." Appellant offered no contradictory evidence on this point.

Dr. Lang stated in his deposition that he had performed hundreds of total hip replacement surgeries and had never done one without an assistant: "I don't know of anyone who has done one without an assistant of some sort . . . I mean, it's ludicrous to think about doing this [surgery] without an assistant." Dr. Howard agreed that an assistant surgeon was required for appellant's surgery. He stated that he had done some 200 hip replacement surgeries, as the lead surgeon, and in each case he had used an assistant. He did not know any orthopedic surgeon who would perform such surgery without an assistant. Once again, appellant presented no contradictory or conflicting evidence.

exists." (*Ibid.*, italics added.) Then, a few lines later—and again without voicing any dissatisfaction with the standard test—the court put it this way: "We conclude that when the operating surgeon determines that an *unforeseen complexity* creates the medical necessity to obtain assistance to complete ongoing surgery in order to protect the health of the patient, an emergency exists within the meaning of the Good Samaritan law." (*Ibid.*, italics added.)

Drawing from these expressions, appellant argues that no medical emergency existed in the instant case because it should have been forseeable to Dr. Lang that the illness of Dr. O'Neill would prevent him from completing the surgery. Thus, appellant reasons, there was no medical emergency and Dr. Howard is not entitled to immunity under section 2396. We do not agree.

We read *Kearns* much differently than does appellant. We understand each of the expressions of the Court of Appeal's reasoning in *Kearns* to be a simple articulation of its holding in a factually precise manner and not to be the pronouncement of a new rule of law in which foreseeability becomes the sole litmus of emergency.

To read *Kearns* as appellant does fails to square with the language of section 2396, which does not make the prescience of the *treating* physician an element of its immunity. Instead, its focus is upon the *responding* physician and upon that physician's good faith. As we read section 2396 it protects the physician who responds in good faith irrespective of whether the treating physician who called for assistance could have or should have anticipated the situation which created the emergency and the need for assistance.

■ Injecting an element of foreseeability would not only make little grammatical sense, it would defeat the plain intent of the statute, that is, to encourage physicians to respond to requests for aid in medical emergencies and thereby provide medical care to those who might not otherwise receive it. (Cf. *Burciaga* v. *St. John's Hospital, supra,* 187 Cal.App.3d 710, 716; *Colby* v. *Schwartz, supra,* 78 Cal.App.3d 885, 892-893.) If the responding physician has to question the treating physician about whether he or she knew or should have known that the medical emergency would arise during surgery, we doubt whether many physicians would answer the call for emergency assistance. Nor do we believe that was what the Legislature had in mind in enacting section 2396.

We abide by our initial conclusion: the trial court properly determined by way of summary judgment that Dr. Howard rendered emergency medical care when he assisted Dr. Lang on appellant's surgery.

## D.

■ Appellant also tries to create a triable issue of fact about whether Dr. Howard had a preexisting duty to render professional care to her. Once again we find none.

Appellant starts by attempting to establish an existing patient-physician relationship between herself and Dr. Howard simply on the basis that three years earlier (in 1985) Dr. Howard had assisted Dr. Lang on another hip surgery upon her. The undisputed evidence, however, established that the patient-physician relationship ended after that surgery. Dr. Howard did not see, much less treat, appellant again until the emergency call to aid Dr. Lang in the instant surgery.[8]

Appellant can point to no authority to support her premise that a preexisting duty of care for purposes of the Good Samaritan laws exists merely because at some time in the past the injured party has been a patient of the responding physician. Certainly section 2396 does not require that the injured party be a complete stranger to the Good Samaritan; nor does common sense. Instead, all that is required is that there be no current patient-physician relationship. We are not the first court to come to that conclusion. (See *Markman* v. *Kotler* (1976) 52 App.Div.2d 579 [382 N.Y.S.2d 522, 523] [rejecting contention that New York Good Samaritan statute applies only when physician gives emergency treatment to a stranger].)

Faring no better is appellant's attempt to create a preexisting duty of care on the basis of the professional relationship between Dr. Lang and Dr. Howard. Again the evidence is undisputed. The two physicians had shared office space—rent, office equipment and materials—from June of 1983 until October 1987. They were not business or corporate partners. They did not have a common practice nor did they share revenues. At the time of the June 1988 surgery they had no ongoing business relationship. Although Dr. Howard had referred as many as 10 patients to Dr. Lang in the past, it was not his practice to make such referrals. The two were members of an "on-call" group with "Dr. O'Neill and a fourth physician. Scheduled at the beginning of the month, each would provide coverage for weekends and vacations. ■ ■ ■ The agreement did not involve or require assis-

---

[8]Appellant was quite candid about her working relationship with Dr. Howard: "if Dr. Howard was sitting here at this table, I wouldn't know who he was." Dr. Howard was no more familiar with appellant than she was with him ("I am not sure who this lady is") and did not remember her surgery in 1985: "I didn't even realize I had been part of any surgery on Mrs. Perkins [in 1985] until I saw a copy of the operative report today."

tance during surgery on a stat[9] basis. According to Dr. Howard the on-call relationship was not the reason he responded to the emergency call: "I think that I would have responded, because of the situation, to any of the orthopods in town if they were in trouble."

■ Because of their relationship it might have been reasonable for Dr. Lang to expect that Dr. Howard would respond to the hospital's request for assistance during surgery. But that expectation did not create a duty to respond: Dr. Howard could have declined. Appellant was not Dr. Howard's patient, Dr. Howard did not have a financial interest in Dr. Lang's treatment of appellant, and he did not have an employment obligation to respond. In the true sense of the word, Dr. Howard acted as a "volunteer" when he came into the operating room. (Cf. *McKenna* v. *Cedars of Lebanon Hospital, supra,* 93 Cal.App.3d at p. 288 [hospital resident who responded to stat call on another doctor's patient and whose employment contract did not require him to respond was a volunteer]; *Burciaga* v. *St. John's Hospital, supra,* 187 Cal.App.3d at p. 716 [pediatrician visiting patients in a hospital who responded to stat call by a obstetrician in the delivery room was a volunteer where the pediatrician had no obligation to respond to the call and the obstetrician did not customarily refer patients to him]; *Kearns* v. *Superior Court, supra,* 204 Cal.App.3d 1325, 1327-1329 [physician visiting patients in hospital who responded to a stat call in the operating room and who had not treated, diagnosed, consulted or participated in the care of the patient was a volunteer].)[10]

## *Conclusion*

The trial court properly determined by way of summary judgment that Dr. Howard had an absolute defense of immunity to appellant's claim of medical

---

[9]("Stat," an abbreviation of the Latin word "statim," means immediately. (Webster's New Internat. Dict. (3d ed. 1965) p. 2228; Black's Law. Dict. (6th ed. 1990) p. 1409.)

[10]Very different from the case at hand, and illustrative of who is not a volunteer within the meaning of the Good Samaritan doctrine, is the physician in *Street* v. *Superior Court, supra,* 224 Cal.App.3d 1397. There Dr. Chang, a family practitioner, and his brother owned and operated a medical facility. During a routine intravenous pyelogram performed by a facility radiologist, the patient developed an immediate and severe allergic reaction to the dye. When the radiologist called for assistance, Dr. Chang responded, and did so poorly. The patient died. In a subsequent wrongful death suit, Dr. Chang argued he was a volunteer entitled to be shielded by the Good Samaritan laws. Not surprisingly, the reviewing court disagreed: "Street was a patient scheduled for diagnostic tests in Chang's own clinic. Although he was neither qualified to perform the test nor directly responsible for her treatment, he had a professional and ethical, not to mention a pecuniary, interest in her care. He was not a 'volunteer' within the meaning of the Good Samaritan statutes." (*Id.* at p. 1403.)

This case is distinctly different: Dr. Howard had neither a professional nor pecuniary interest in appellant's care at the time he received the call from the hospital requesting his assistance in surgery.

malpractice. He therefore was entitled to a judgment dismissing him from the action.

The judgment is affirmed. Respondent to recover costs on appeal.

Perley, J., and Reardon, J., concurred.