[No. B044369. Second Dist., Div. Three. Oct. 2, 1991.]

MARY BREAZEAL, Plaintiff and Appellant, v.
HENRY MAYO NEWHALL MEMORIAL HOSPITAL et al., Defendants
and Respondents.

## Counsel

Gerard E. Sabo for Plaintiff and Appellant.

George McDonald, Kirtland & Hager, Ronald Hager, Greines, Martin, Stein & Richland, Irving H. Greines, Marc J. Poster and Barbara W. Ravitz for Defendants and Respondents.

## Opinion

**CROSKEY, J.**—Mary Breazeal (Mary) appeals from a judgment of nonsuit on causes of action for professional negligence and wrongful death in favor of Krishan Vashistha, M.D., and Roger Haring, M.D., and from a judgment of dismissal as to an additional cause of action for negligent infliction of emotional distress. The defendant doctors were allegedly negligent in treat-

ing Mary's eight-year-old son, Matthew Breazeal (Matthew), who died of a serious, but usually treatable, condition while under their care.[1]

The cause of action for negligent infliction of emotional distress was dismissed before trial on grounds that no evidence established that Mary witnessed an event that caused injury to Matthew or that she contemporaneously was aware than any such event was causing him injury. Nonsuit on the causes of action for professional negligence and wrongful death was granted on grounds that the physicians were at all times rendering emergency care to Matthew and were consequently relieved of liability under Business and Professions Code sections 2395 and 2396,[2] the "Good Samaritan" statutes applicable to physicians who render emergency care, for any acts or omissions they may have committed in the course of rendering such care.

In this case, we examine the scope and extent of the term "emergency care" as it is used in the Good Samaritan statute. A reasonable application of that statute requires us to conclude that an emergency entitling a responding physician to immunity thereunder will persist for as long as the patient reasonably requires urgent care both to treat the immediate threat to life or limb and to ensure that such threat has passed.

Applying such principle to the facts of this case, we find there was no substantial evidence that the emergency to which the defendant physicians initially responded had concluded at any time during the course of their treatment of Matthew, and that sections 2395 and 2396 therefore shield them from liability for any acts or omissions by them in rendering such treatment. We therefore affirm the judgment.

---

[1] Henry Mayo Newhall Memorial Hospital, where Matthew was treated for epiglottitis, and Dr. Edward Dag, who served as the anesthesiologist during Matthew's tracheostomy surgery and rendered postoperative care, were also named in the complaint. Dr. Dag and the hospital both settled with Mary, and the case proceeded to trial against Drs. Haring and Vashistha only.

[2] Unless indicated otherwise, all further statutory references will be to the Business and Professions Code.

Section 2395 provides as follows:

"*No licensee who in good faith renders emergency care at the scene of an emergency, shall be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care.* [¶] " 'The scene of an emergency' " as used in this section shall include, but not be limited to, the emergency rooms of hospitals in the event of a medical disaster. 'Medical disaster' means a duly proclaimed state of emergency or local emergency declared pursuant to the California Emergency Services Act (Chapter 7 (commencing with Section 8550) of Division 1 of Title 2 of the Government Code)." (Italics added.)

Section 2396 provides as follows:

"No licensee, who in good faith upon the request of another person so licensed, renders emergency medical care to a person for medical complication arising from prior care by another person so licensed, shall be liable for any civil damages as a result of any acts or omissions by such licensed person in rendering such emergency medical care."

### Factual Background

Matthew woke up with a headache, earache and fever on the morning of February 12, 1983, and by evening he was having trouble breathing. Mary brought Matthew to the emergency room at Henry Mayo Newhall Memorial Hospital (Mayo Hospital). When asked whether Matthew had a regular pediatrician, Mary answered that he did not, but Dr. Vashistha, a pediatrician on the hospital's staff and one of the respondents herein, had treated her younger son, John, for a minor ailment. She asked that Dr. Vashistha be called.

Dr. Vashistha, who was reached at a family gathering, came to the hospital, examined Matthew, and diagnosed epiglottitis, an acute bacterial infection that results in swelling of the epiglottis and other throat structures. Such swelling can be sufficiently severe to block the breathing passages and cause death. Treatment for epiglottitis involves the establishment of an artificial airway, either by means of an endotracheal tube inserted through the mouth or nose, or by means of a tracheostomy tube inserted through a hole in the neck. After establishment of an artificial airway, the patient's condition remains at least potentially critical until the infection is controlled by means of antibiotics, and the swelling is relieved. Until such time, the patient's life literally depends upon constant monitoring to assure that the airway remains in place and clear of mucous and other obstructions. The entire course of treatment ordinarily takes from three to five days, and may take as long as seven days.

Upon diagnosing Matthew's condition as epiglottitis, Dr. Vashistha requested that an otolaryngologist, or ear, nose, and throat (ENT) specialist be called to the hospital to assist in Matthew's treatment. Dr. Haring, the second respondent herein, was called. ▉▉ ▉▉ Dr. Haring was a member of the Mayo Hospital's staff and was called to assist in emergencies on a semiregular basis, although he was not a member of its emergency panel.[3]

At approximately 9 p.m., after Dr. Haring arrived at Mayo Hospital and completed his examination of the patient, Matthew was taken from the

---

[3]We had some initial concern as to whether Dr. Haring qualified for protection under the Good Samaritan statutes. It appeared from Dr. Haring's testimony that he may have responded to emergency calls at Mayo Hospital as a normal part of his overall practice. The Good Samaritan statutes do not apply to physicians who render emergency aid as part of their normal course of practice. (*Colby* v. *Schwartz* (1978) 78 Cal.App.3d 885, 893 [144 Cal.Rptr. 624].) However, based upon supplemental briefing by the parties, and a detailed review of the entire record, we have concluded that the evidence does not establish that response to emergencies was a sufficiently substantial part of Dr. Haring's overall practice to exclude him from Good Samaritan immunity.

emergency room to the operating room. There, Dr. Dag, an anesthesiologist, inserted an endotracheal tube into Matthew's throat. Dr. Haring testified at trial that Matthew was breathing freely at this point. According to Dr. Rudolph Brutoco, who testified as an expert witness for Mary, the danger of Matthew dying from epiglottitis was, at that point, very small given the level of medical technology as of 1983. However, Dr. Brutoco also testified that Matthew's condition was at all times "volatile" and there was always a potential for "immediate demise."[4]

With a functioning artificial air passage in place in Matthew's trachea, the treating physicians considered two alternatives with respect to further treatment: They could transfer Matthew to a facility, such as Children's Hospital in Los Angeles, with special expertise in treating pediatric epiglottitis, or they could perform a tracheostomy at Mayo Hospital and keep Matthew there for postoperative care. Mayo Hospital had no pediatric ward or pediatric intensive care unit; the sole recovery room nurse on duty on the night of February 12 had only six months' experience as a recovery room nurse and no experience caring for epiglottitis patients. In addition, neither Dr. Haring nor Dr. Vashistha nor Dr. Dag had extensive or recent experience caring for epiglottitis patients, pediatric or adult. On the other hand, certain risks would be incurred in transporting Matthew to Children's Hospital. They included the risk of an accident during such transfer, as well as the risk that Matthew's condition might take a turn for the worse while in transport, where adequate measures to restore stability would not be possible.[5]

Deciding to retain Matthew at Mayo Hospital, Dr. Haring performed a tracheostomy, assisted by Dr. Vashistha. After the tracheostomy, at approximately 9:55 p.m., Matthew was brought to the recovery room, accompanied by Dr. Dag, the anesthesiologist. In Dr. Dag's opinion, Matthew was in stable condition at this point. While Dr. Dag accompanied Matthew to the recovery room, Dr. Haring and Dr. Vashistha went to talk with Mary. Dr.

---

[4]Indeed, all of the medical witnesses expressed agreement with the proposition that Matthew's condition presented a continuing risk of sudden death. In granting the defendants' motion for nonsuit, the trial court expressed its view that the evidence established beyond dispute that the emergency was of a continuing nature.

[5]Such risks were very real concerns. Later, when he was in extremis, Matthew was, in fact, transported to Children's Hospital. From the time Children's Hospital received the call requesting transport at 11:30 p.m., it took 15 minutes for the transport helicopter to reach Children's from its base at Daniel Freeman Hospital. The helicopter spent approximately 25 minutes at Children's Hospital, and departed for Mayo Hospital at 12:15 a.m. on February 13. The trip took 15 minutes. The return trip, begun at 2 a.m., was not completed until 4 a.m., as the helicopter encountered fog three to five minutes into the return trip, and Matthew had to be returned to Mayo Hospital, transferred to an ambulance, and brought to Children's Hospital by surface transportation.

Haring told her that the emergency was over, but Matthew was not yet out of the woods and would have to be watched very carefully.

After talking with Mary, Dr. Haring returned to the recovery room, where he discovered that Matthew's tracheostomy tube was out of position. He repositioned it, and to make sure it did not come out of position again, he supplemented or replaced the umbilical ties that had originally held the tube in place with sutures. He also ordered soft restraints placed on Matthew to prevent him from pulling the tube loose. He ordered chest X-rays to check for pneumothorax, or lung collapse. Finding none, he remained with Matthew until he felt the airway was secure and that he could do no more. He then left the hospital at approximately 10:30 p.m., after leaving written instructions for the recovery room nurse, including instructions that a spare tracheostomy tube and implements for inserting it be kept at Matthew's bedside and that he and Dr. Vashistha be called if the existing airway should become dislodged again. Dr. Vashistha's home was approximately a half mile from the hospital, a 5-minute trip; Dr. Haring lived 10 to 15 miles from the hospital, a trip of 15 or 20 minutes. Dr. Vashistha left the hospital at approximately the same time, intending to meet his family at the place where they had been visiting, take them home, then return to attend to Matthew. Dr. Vashistha had his electronic pager with him when he left, and he orally instructed Dr. Dag and Nurse Margrave to call him if even the slightest change occurred in Matthew's condition.

In addition to instructions to keep a spare tracheostomy tube at Matthew's bedside and call the surgeon and pediatrician if the existing tube should dislodge, the recovery room nurse was instructed to suction the tube regularly to keep it free of secretions which might obstruct breathing. In the course of performing this suctioning, the nurse suctioned a pink frothy sputum. The presence of pink frothy sputum indicates that a patient is suffering from pulmonary edema, or fluid in the lungs, a condition that impedes proper respiration. In addition, approximately 45 minutes after being brought to the recovery room, that is, at approximately 10:45 p.m., Matthew became restless, a further indication that he was not receiving adequate oxygen.

Upon being informed of the presence of the pink sputum, Dr. Dag, who remained in the recovery room with Matthew, ordered administration of the medication lasix to relieve the pulmonary edema. However, at approximately this time, Matthew's tracheostomy tube again became dislodged. Dr. Dag attempted to replace the tracheostomy with an endotracheal tube, but experienced difficulty ventilating Matthew through the new tube. After unsuccessfully attempting for approximately five minutes to ventilate Matthew

through the replacement tube, he concluded that the tube must be plugged and replaced it with a second replacement tube. When he continued to meet resistance to ventilation, he determined that the resistance was not caused by a blockage within the tube, but by bilateral pneumothorax (gasses in the chest cavity, but outside the lungs, causing the lungs to collapse, and consequently causing resistance to air coming into the lungs).

Dr. Haring was called back to the hospital at approximately 11:15 or 11:30 p.m. Dr. Vashistha had already returned at approximately 11:20. Within a short time after Dr. Haring's arrival, it was determined that both Matthew's lungs were collapsed. In addition, his heartbeat slowed to a rate characteristic of a dying patient. Shortly thereafter, Matthew went into full cardiac arrest.

Emergency room physicians and the Mayo Hospital's "code blue" team were called, and cardiopulmonary resuscitation and medications were administered to stimulate heart action. In addition, a pediatric emergency team from Children's Hospital of Los Angeles was called at approximately 11:30 p.m., and arrived by means of the "Life-Flight" helicopter (see fn. 5, *ante*). By the time the life-flight team arrived at 12:30 a.m., however, Matthew was in a state of electromechanical dissociation, a state in which the heart is generating electrical impulses, but is not pumping blood to the body. His eyes were dilated and fixed, and it was the opinion of John Koenig, M.D., a pediatric intensive care specialist who came on the Life-Flight helicopter, that he was brain dead. Nonetheless, Matthew was transported on life support to Children's Hospital, where a nuclear brain scan was performed. It confirmed brain death. Matthew was removed from the life support systems and pronounced dead at Children's Hospital the following afternoon.

## CONTENTIONS ON APPEAL

Mary does not deny that the physicians initially came to Matthew's aid in good faith and in circumstances amounting to a life-threatening emergency. She contends, however, that (1) the emergency initially created by Matthew's illness ended after an artificial airway was placed in Matthew's throat, because Matthew's condition was stable at that point, and only maintenance activity was required to assure continuation of the stable condition; (2) the emergency was over after placement of the artificial airway because at that point Matthew could have been transferred to Children's Hospital of Los Angeles, where superior care for Matthew's condition was available; (3) a doctor-patient relationship came into existence when the defendant doctors elected not to transport Matthew to Children's Hospital,

but to assume responsibility for his care themselves; (4) Matthew's death was the result of negligence on the part of the defendant doctors, which occurred after the emergency ended and after the doctors established a physician-patient relationship with Matthew; [6] and (5) the trial court improperly dismissed Mary's action for negligent infliction of emotional distress.

## DISCUSSION

### 1. Standard of Review

Nonsuit for a defendant is proper if a plaintiff presents insufficient evidence on an element of the case (*Brimmer* v. *California Charter Medical, Inc.* (1986) 180 Cal.App.3d 678, 684 [225 Cal.Rptr. 752]; *Mikalian* v. *City of Los Angeles* (1978) 79 Cal.App.3d 150, 166 [144 Cal.Rptr. 794]), or if the plaintiff's evidence establishes an affirmative defense that defeats the cause of action. (*Doria* v. *International Union* (1961) 196 Cal.App.2d 22, 33 [16 Cal.Rptr. 429]; *Meadows* v. *Emett & Chandler* (1948) 86 Cal.App.2d 1, 11 [193 P.2d 785].) Here, nonsuit was granted on grounds that the evidence established the defendants' affirmative defense of Good Samaritan immunity under sections 2395 and 2396. The court found that the uncontradicted evidence established that the physicians responded to a continuing emergency and rendered care to Matthew in good faith, having no preexisting duty to do so.

Mary's acknowledgment that an emergency once existed is no impediment to her contention that the emergency ended before the negligent acts occurred, and that consequently the Good Samaritan defense was not established. The issue of whether an emergency that initially triggered Good Samaritan immunity continued to exist at any given juncture is an issue of fact, which must be determined in the same manner as the issue of whether an emergency existed in the first instance. On review, we view the evidence of the duration of the emergency in the light most favorable to Mary. (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656]; *De Lima* v. *Magnesite Waterproofing and Refinishing* (1987) 191 Cal.App.3d 776, 779 [236 Cal.Rptr. 519].)

---

[6]Mary contends the defendant physicians committed professional negligence in the following ways: (1) by rejecting the option of transferring Matthew to Children's Hospital of Los Angeles; (2) by failing to recognize signs appearing soon after surgery that Matthew was being insufficiently oxygenated; (3) by ordering an inappropriate dosage of epinephrine when Matthew suffered cardiac arrest; and (4) by failing to recognize that Matthew was in electromechanical dissociation prior to the arrival of the Life-Flight team and to administer CPR at that time.

2. *Because Matthew Was in Urgent Need of Care From the Time He Arrived at Mayo Hospital Until Death, an "Emergency" Entitling the Defendant Physicians to Immunity Under the Good Samaritan Statutes Existed for That Entire Time.*

 An emergency within the meaning of the Good Samaritan statutes exists when there is an urgent medical circumstance of so pressing a character that some kind of action must be taken. (*Kearns* v. *Superior Court* (1988) 204 Cal.App.3d 1325, 1328 [252 Cal.Rptr. 4]; *Newhouse* v. *Bd. of Osteopathic Examiners* (1958) 159 Cal.App.2d 728, 735-736 [324 P.2d 687].) It would seem obvious that in determining whether a patient's condition constitutes such an emergency the trier of fact must consider the gravity, the certainty, and the immediacy of the consequences to be expected if no action is taken. However, beyond observing that these are the relevant considerations, the variety of situations that would qualify as emergencies under any reasonable set of criteria is too great to admit of anything approaching a bright line rule as to just how grave, how certain, and how immediate such consequences have to be.

Few cases have directly addressed the issue of whether a given set of circumstances constitutes an emergency. In the few that have, emergencies were found where the consequences of inaction ranged from an immediate certainty of death (*Burciaga* v. *St. John's Hospital* (1986) 187 Cal.App.3d 710, 713-714 [232 Cal.Rptr. 75]) to a high probability of a future risk of serious injury (*Perkins* v. *Howard* (1991) 232 Cal.App.3d 708, 715-716, fn. 7 [283 Cal.Rptr. 764].)

In *Burciaga* v. *St. John's Hospital, supra,* 187 Cal.App.3d 710, the Court of Appeal rejected in one short paragraph a contention that no emergency existed where an obstetrician discovered upon delivery of a newborn that the umbilical cord was entangled about the child's neck and feet, and the child was cyanotic and in respiratory distress, requiring the immediate assistance of the defendant pediatrician to resuscitate the child. (187 Cal.App.3d at p. 714.)

In *Kearns* v. *Superior Court, supra,* 204 Cal.App.3d 1325, the consequences of inaction were as grave and as certain as those in *Burciaga, supra,* although they were less immediate, where, in the midst of surgery to remove a malignant ovarian tumor, the surgeon found he could not remove the tumor without additional assistance. (204 Cal.App.3d at p. 1327.) This court issued a peremptory writ of mandate directing entry of summary judgment or summary adjudication of issues in favor of the defendant physician who provided assistance at the surgeon's request. (*Id.* at p. 1330.) We found that

an emergency exists where unexpected complications arising during a critical stage of surgery produce a pressing necessity for immediate interoperative assistance. (*Id.* at p. 1328.)

By contrast, in *Bryant* v. *Bakshandeh* (1991) 226 Cal.App.3d 1241 [277 Cal.Rptr. 379], the Court of Appeal reversed an order granting summary judgment where, after anesthetizing an infant patient for an elective surgery, but before making an initial incision, the surgeon had difficulty inserting a catheter and requested the defendant urologist's assistance. (226 Cal.App.3d at pp. 1243, 1248.) Under these circumstances, the court found there was a triable issue of fact as to whether the defendant was responding in good faith to an emergency within the meaning of the Good Samaritan statutes. (*Id.* at p. 1247.)

In the recently decided case of *Perkins* v. *Howard, supra,* 232 Cal.App.3d 708, the plaintiff had been anesthetized for total hip replacement surgery, and surgery was approximately 15 minutes under way, when the assistant surgeon became ill and could not continue. The defendant responded to the chief surgeon's request that he serve as assistant for the remainder of the surgery. The Court of Appeal affirmed an order granting summary judgment entered upon the defendant's defense under section 2396. The court found that once the plaintiff had been anesthetized, and surgery was substantially under way, completion of the surgery was necessary, based upon the uncontradicted opinion of the defendant and the chief surgeon that the plaintiff would have been exposed to an increased risk of infection, serious injury or death, if surgery had been terminated at that point and undertaken again at a later time. (232 Cal.App.3d at pp. 715-716, fn. 7.) Replacement of the assistant surgeon was also found necessary, based upon the uncontradicted opinion of the chief surgeon that the very thought of performing hip replacement surgery without an assistant was "ludicrous." (*Ibid.*)

 In the present case, the consequences of inaction were as grave, immediate, and certain as can be imagined when Matthew arrived at Mayo Hospital in respiratory distress and in danger that his breathing would become completely obstructed at any moment. At this point, a destructive chain of events was actually in motion. Immediate intervention was imperative to avert a presently impending calamity. (Cf. *Kearns* v. *Superior Court, supra,* 204 Cal.App.3d at p. 1328; *Burciaga* v. *St. John's Hospital, supra,* 187 Cal.App.3d 710, 714.)

After an artificial airway was successfully established, the prospect of complete obstruction of Matthew's ability to breathe was less certain and less immediate, and the only action needed was "maintenance" activity,

rather than affirmative intervention. On this basis, Mary contends the emergency was ended. We cannot agree.

Arguably, Matthew's condition was "stable" in the sense that a destructive chain of events was no longer actually in motion. However, where stability was being maintained only by means of an artificial airway that had to be constantly monitored to prevent a new obstruction, and where Mary's own expert witness characterized Matthew's condition as a "highly volatile" one with a potential for "immediate demise," an emergency demanding action persisted by any reasonable view of the circumstances. Even though the immediately impending calamity had been turned aside, there was an ongoing urgent need for the utmost care in guarding against reemergence of the original threat.

Mary contends, however, that the physicians are not entitled to Good Samaritan immunity after creation of the artificial airway, because Matthew's condition was sufficiently stable at that point that he could have been transferred to Children's Hospital of Los Angeles, an institution with a pediatric intensive care unit, which Mayo Hospital did not have, and with particular expertise in dealing with pediatric epiglottitis, which the staff at Mayo Hospital did not have. In effect, Mary argues that a reasonable alternative to care by the defendants was reasonably available, and Matthew was in sufficiently stable condition for the alternative to be pursued. Therefore, the defendants were not at that point rendering emergency care in good faith within the meaning of the statute. Rather, by electing to retain Matthew at Mayo Hospital and care for him themselves, Mary contends the doctors established a doctor-patient relationship with him, and their further care of Matthew must consequently be judged under normal standards of professional care.

There is no support in the language of the Good Samaritan statutes for such a limitation on the immunity provided by those statutes. Nor would such a limitation produce results consistent with the statutory purpose of inducing physicians to provide emergency care to individuals who, though in urgent need of such care, would otherwise not receive it. (*Colby* v. *Schwartz, supra*, 78 Cal.App.3d, at p. 891.) The encouragement provided by the statute to provide emergency care will be inevitably and greatly diminished if physicians know that, however urgently *some* care might be needed in any given situation, the availability of Good Samaritan immunity will depend upon whether the responding physician guesses correctly as to whether he or she is the best person reasonably available to provide that care. The statutory purpose would be seriously undermined if immunity were denied to physicians who provided care where care was plainly and urgently needed, merely

because a jury could conclude with the benefit of hindsight that another physician would have provided superior care.[7]

The defendants' assertion of the Good Samaritan defense was not contradicted by evidence that Dr. Haring told Mary, after he had completed the tracheostomy surgery, that the emergency was past, or by evidence that Dr. Haring and Dr. Vashistha left the hospital after the surgery. The doctors' departure from Mayo Hospital was not inconsistent with the existence of an ongoing emergency, where Matthew was expected to remain in a potentially critical condition for as long as seven days, creating a clear need for the doctors to rotate with one another in caring for him; where neither Dr. Haring nor Dr. Vashistha had any reason to believe before their departure that Dr. Dag was not fully competent to manage any of the problems that were to be expected; where Dr. Haring left detailed instructions for Matthew's care, including instructions that a spare tracheostomy tube be immediately accessible at Matthew's bedside and instructions that he and Dr. Vashistha be called if Matthew's condition changed; where Dr. Vashistha took into consideration before deciding to leave that he lived only a five-minute drive from Mayo Hospital; and where Dr. Haring lived only twenty minutes away. With regard to Dr. Haring's statement that the emergency was past, it tends to prove he was optimistic, nothing more. In the context in which it was made, such statement is not reasonably probative of the issue before us.

■ The test for determining the existence of an emergency is objective: whether the facts establish the existence of an emergency of so pressing a character that some kind of action must be taken. (*Bryant* v. *Bakshandeh, supra,* 226 Cal.App.3d 1241; *Kearns* v. *Superior Court, supra,* 204 Cal.App.3d at p. 1328.) That such action constitutes "maintenance" of an emergency patient's now stabilized condition, cannot justify the conclusion that the emergency has ended. The facts of this case establish that although Matthew was breathing freely once his artificial airway was established, he could not have breathed without the airway, and even for him to continue breathing with the airway, he had to be continuously monitored to assure that the airway did not become dislodged or plugged, resulting in certain and immediate death. ■ Where such an urgent need of care persisted in order to preserve life after death had been narrowly avoided, the emergency circumstances clearly persisted.

---

[7]We note, in addition, that Mary cites the defendants' decision not to transfer Matthew to Children's Hospital of Los Angeles as a separate instance of professional negligence. The policy of encouraging doctors to provide emergency care would be doubly thwarted if doctors not only could lose immunity under the Good Samaritan statutes by failing to obtain alternative care later determined to be superior and reasonably available, but also could incur professional negligence liability by that same act.

### 3. The Evidence Does Not Establish Any Basis for Mary's Claim of Emotional Distress

■ The defendants' immunity under the Good Samaritan statutes precludes liability for *any* civil damages as a result of their actions in rendering care to Matthew, including liability for emotional distress caused to Mary. In addition, the trial court correctly found that no evidence established that Mary witnessed an event that caused injury to Matthew or that she contemporaneously was aware that any such event was causing him injury. There was evidence that at some point Mary saw Dr. Vashistha bent over Matthew, with blood on both of them. However, there was no evidence either that what Dr. Vashistha was doing at that moment was "an injury-producing event," rather than an unsuccessful attempt to correct an already existing injury, or that Mary contemporaneously believed she was witnessing an injury-producing event. Absent such evidence, a plaintiff cannot recover damages for negligent infliction of emotional distress. (*Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 647 [771 P.2d 814]; *Wright* v. *City of Los Angeles* (1990) 219 Cal.App.3d 318, 350 [268 Cal.Rptr. 309].)[8]

### Disposition

The judgment is affirmed. The parties shall bear their own costs on appeal.

Danielson, Acting P. J., concurred. Hinz, J., concurred in the result only.

---

[8]Because we find that the defendant physicians were clothed with immunity under the Good Samaritan statutes throughout their care of Matthew, we need not address the issue of whether such care was negligently rendered.